

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_Michelle V. Larson_

**Signed April 7, 2023**

—————————————————————
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Northwest Senior Housing Corporation, *et al.*,[1] | Case No. 22-30659 (MVL) |
| Debtors. | (Jointly Administered) |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
### CONFIRMING CHAPTER 11 PLAN OF PLAN SPONSORS

Northwest Senior Housing Corporation and Senior Quality Lifestyles Corporation (collectively, the "**Debtors**"), having:

a.  commenced chapter 11 cases (together, the "**Chapter 11 Cases**") on April 14, 2022 (the "**Petition Date**"), by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**");

b.  continued to operate their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108;

c.      filed jointly with UMB Bank, N.A., in its capacity as successor bond trustee and
        master trustee (the "**Trustee**") and as lender under the DIP Credit Agreement (the
        "**DIP Lender**" and together with, the Trustee, and the Debtors, the "**Plan
        Sponsors**"), initial versions and, ultimately, the *Fourth Amended Chapter 11 Plan
        of Plan Sponsors Dated February 17, 2023* [Docket No. 1241] (as may be amended,
        modified, and/or supplemented, the "**Plan**")[1];

and the Plan Sponsors having:

d.      obtained approval of the Disclosure Statement by that certain *Order Approving
        Disclosure Statement and Granting Related Relief* [Docket No. 936] (the
        "**Disclosure Statement Order**"), docketed on December 19, 2022;

e.      obtained approval of (i) bidding procedures by that certain *Order (I) Authorizing
        and Approving the Bidding Procedures; (II) Authorizing entry into the Stalking
        Horse Asset Purchase Agreement; (III) Approving Procedures related to the
        Assumption of certain Executory Contracts and Unexpired Leases; (IV) Scheduling
        Combined Confirmation and Sale Hearing and (V) Granting Related Relief* [Docket
        No. 946] (the "**Bidding Procedures Order**") and (ii) solicitation procedures and
        related forms, notices, and ballots in connection with a prior version of the Plan by
        that certain *Order (I) Establishing Voting Record Date and Other Deadlines; (II)
        Authorizing Kurtzman Carson Consultants LLC to Act as the Voting Agent with
        respect to the Plan; (III) Approving Solicitation and Notice Procedures; (IV)
        Approving Manner and Forms of Ballots, Notices and Related Documents; and (V)
        Granting Related Relief* [Docket No. 947] (the "**Solicitation Procedures Order**"),
        each docketed on December 20, 2022;

f.      caused the Plan Sponsors' solicitation and tabulation agent, Kurtzman Carson
        Consultants LLC ("**KCC**"), to transmit and distribute solicitation materials, in
        accordance with the Solicitation Procedures Order, on or before December 22,
        2022, consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy
        Procedure (the "**Bankruptcy Rules**") and the Solicitation Procedures Order, as
        evidenced by and described in the *Certificate of Service* [Docket No. 978] (the
        "**Solicitation Certificate**");

g.      caused KCC to publish the Court-approved Confirmation and Sale Hearing Notice
        (as defined below) in (i) *The New York Times National Edition* on December 28,
        2022 and (ii) *The Dallas Morning News* on December 29, 2022, as evidenced by
        and described in the *Affidavit of Publication of the Notice of Hearing Regarding (I)
        Confirmation of the Third Amended Plan of Reorganization of the Plan Sponsors
        Dated December 19, 2022; (II) Approval of the Sale Transaction; and (III) Related
        Voting and Objection Deadlines* [Docket No. 1008] (the "**Publication Affidavit**");

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

h.     filed on January 13, 2023, the *Notice of Filing of Plan Supplement* [Docket No. 1039], which included drafts of the Litigation Trust Agreement, Residents Trust Agreement, and list of Executory Contracts and Unexpired Leases;

i.     obtained that certain *Amended Plan and Sale Deadlines* order [Docket No. 1056], docketed on January 17, 2023;

j.     filed, on January 24, 2023, the *Certification of Andres A. Estrada with respect to the Tabulation of Votes on the Third Amended Plan of Reorganization of the Plan Sponsors Dated December 19, 2022* [Docket No. 1101];

k.     filed, on February 6, 2023, the (i) *Notice of (I) Cancellation of Auction, (ii) Designation of The Stalking Horse Bidder as The Successful Bidder, and (iii) Amendment to Stalking Horse Asset Purchase Agreement* [Docket No. 1149], designating Bay 9 Holdings, LLC as the successful bidder with respect to the sale of substantially all of Edgemere's assets and (ii) the *Notice of Exhibits to Plan Supplement* [Docket No. 1050];

l.     filed, on February 16, 2023, the *Amended Certification of Andres A. Estrada with Respect to the Tabulation of Votes on the Third Amended Plan of Reorganization of the Plan Sponsors Dated December 19, 2022* [Docket No. 1218] (the "**Balloting Declaration**");

m.     filed, on February 17, 2023, (i) filed the Plan on February 17, 2023; (ii) the *Plan Sponsors' Brief in Support of Plan Confirmation and Omnibus Reply to Objections* (the "**Confirmation Brief**") [Docket No. 1247]; (iii) the *Declaration of Nick Harshfield, as Treasurer and Vice-Chair of the Debtors, in Support of Confirmation of the Fourth Amended Plan of Reorganization of Plan Sponsors Dated February 17, 2023* [Docket No. 1243] (the "**Confirmation Declaration**"); and (iv) the *Declaration of David B. Fields of RBC Capital Markets, LLC as Investment Banker in Support of the Sale of Substantially all of the Debtor's Assets Pursuant to the Third Amended Plan of Reorganization* [Docket No. 1234] (the "**Fields Declaration**"); and

n.     filed, on March 3, 2023, the *Notice of Exhibits to Plan Supplement* [Docket No. 1309], which included a draft of the Residents Trust Agreement and the First Amended and Restated Settlement and Contribution Agreement.

And Bay 9 Holdings, LLC having:

o.     filed, on March 20, 2023, the (i) *Amended Notice of Second Amendment to Asset Purchase Agreement*, and (ii) Second Amendment to Asset Purchase Agreement [Docket No. 1354].

And this Court having:

p.     held a hearing on the property condition cure asserted by Intercity Investment Properties, Inc. (the "**Landlord**") in its *Amended Statement of Cure Claims with*

3

*Respect to Existing Defaults under Lease Pursuant to 11 U.S.C. 365(b)(1)(A)* [Docket No. 1023], which commenced on January 23, 2023;

q.      issued a bench ruling on the property condition cure asserted by the Landlord on February 6, 2023 [Docket No. 1170] (the "**Property Condition Cure Ruling**"), as supplemented by the *Order Regarding Intercity Investment Properties Inc.'s Amended Statement of Cure Claims with Respect to Existing Defaults under Lease Pursuant to 11 U.S.C. 365(b)(1)(A)* [Docket No. ] (the "**Property Condition Cure Order**");

r.      held a hearing on the pecuniary damages asserted by the Landlord in its pecuniary damages statement [Docket No. 1187-7, Ex. 4] (the "**Pecuniary Damages**"), which commenced on February 13, 2023;

s.      set February 14, 2023 at 4:00 p.m., Central Time, as the deadline to file and serve objections to approval of the Sale Transaction and/or confirmation of the Plan (the "**Plan and Sale Objection Deadline**");

t.      set February 14, 2023 as the deadline for the Landlord to file and serve supplemental objections to adequate assurance of future performance submitted by Bay 9 Holdings LLC;

u.      set February 21, 2023 at 9:30 a.m., Central Time, as the date to consider confirmation of the Plan and approval of the Sale Transaction (the "**Confirmation and Sale Hearing**");

v.      reviewed the Plan, the Disclosure Statement, the Plan Supplement (including, among other things, the Litigation Trust Agreement and the Residents Trust Agreement), the Balloting Declaration, the Confirmation Declaration, the Confirmation Brief, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases,

w.      held the Confirmation and Sale Hearing, including the adequate assurance of future performance submitted by Bay 9 Holdings, LLC, which commenced on February 21, 2023 at 9:30 a.m., Central Time, and continued on consecutive days through February 24, 2023, and then resumed on  March 7, 2023 at 2:00 p.m., Central Time;

x.      issued a bench ruling on the Pecuniary Damages asserted by the Landlord on March 24, 2023 [Docket No. 1366] (the "**Pecuniary Damages Ruling**"), to be supplemented by an order of this Court (the "**Pecuniary Damages Order**");

y.      heard the statements, arguments, and objections made by counsel in respect of Confirmation;

z.      considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

aa.  overruled any objections to the Plan, the Sale Transaction, and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated;

bb.  taken judicial notice of all papers and pleadings filed in these Chapter 11 Cases and all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases; and

cc.  issued a bench ruling confirming the Plan and approving the Sale Transaction on March 27, 2023 [Docket No. 1368] (the "**Confirmation and Sale Ruling**").

**NOW, THEREFORE,** the Court having found that notice of the Confirmation Hearing, and the opportunity for any party in interest to object to Confirmation, has been adequate and appropriate as to all parties-in-interest and other entities affected, benefitted or bound by or to be affected, benefitted or bound by the Plan and this Confirmation Order and the transactions contemplated thereby; and upon consideration of and determining that the legal and factual bases set forth in the documents filed in support of Confirmation, the statements of counsel, all testimony and other evidence proffered, adduced and presented at the Confirmation Hearing, establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact and conclusions of law and order:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

A.  <u>Findings and Conclusions</u>. The findings and conclusions set forth herein, on the record during the Confirmation Hearing, and in the Property Condition Cure Ruling, the Pecuniary Damages Ruling, and the Confirmation and Sale Ruling constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the findings of fact constitute

conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

B.      Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)). This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this judicial district was proper as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L), and this Court has the exclusive jurisdiction to consider Confirmation of the Plan and enter a final order with respect thereto.

C.      Eligibility for Relief. The Debtors were and are entities eligible for relief under Bankruptcy Code section 109.

D.      Commencement and Joint Administration of the Chapter 11 Cases. On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On April 19, 2022, the Court entered that certain *Order Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 88]. The Debtors have operated their businesses and managed their properties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.

E.      Judicial Notice. The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and considers all evidence and arguments made, proffered, or adduced at the various hearings held before this Court during the pendency of the Chapter 11 Cases.

F.      Burden of Proof. The Debtors have the burden of proving the elements of Bankruptcy Code section 1129 by a preponderance of the evidence. The Debtors have met their burden with respect to each applicable element of Bankruptcy Code section 1129.

G.      Official Committee of General Unsecured Creditors. On April 28, 2022, the Office of the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Committee**") pursuant to Bankruptcy Code section 1102(a)(1).

H.      Patient Care Ombudsman. The U.S. Trustee appointed Susan N. Goodman as the Patient Care Ombudsman (the "**PCO**") in these Chapter 11 Cases pursuant to Bankruptcy Code section 333.

I.      Compliance with the Solicitation Procedures Order. On December 20, 2022, the Court entered the Solicitation Procedures Order, approving, *inter alia*, the contents of the solicitation materials and the procedures for solicitation of the Plan. The Plan Sponsors have complied with the Solicitation Procedures Order, in all respects.

J.      Transmittal and Mailing of Solicitation Packages. On December 22, 2022, in accordance with the Solicitation Procedures Order, the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all other applicable laws in connection therewith, the Plan Sponsors caused KCC to transmit and serve solicitation materials, including, among other things, a form of ballot ("**Ballot**"), and notice of the confirmation and sale hearing ("**Confirmation and Sale Hearing Notice**") to the Holders of Claims in Classes 2 (Bond Claims), 4 (General Unsecured Claims), 5 (Participating Former Resident Refund Claims), and 6 (Participating Current Resident Refund Claims) (collectively, the "**Voting Classes**").

      1.      The period during which the Plan Sponsors solicited votes on the Plan was reasonable in the circumstance of the Chapter 11 Cases and enabled holders

in Voting Classes to make an informed decision as to whether to accept or reject the Plan.

2. The Plan Sponsors were not required to solicit votes from holders of Claims in Class 1 (Other Priority Claims) and Class 3 (Other Secured Claims) as such Classes are unimpaired under the Plan and conclusively presumed to have accepted the Plan.

3. The Plan Sponsors were not required to solicit votes from holders of Claims in Class 7 (Intercompany Claims) and Class 8 (Interests in Debtors) as such Classes are not entitled to recover under the Plan and, thus, are conclusively deemed to have rejected the Plan.

K.    Notice. As evidenced by the Solicitation Certificate, Publication Affidavit, and/or Balloting Declaration, and in compliance with the Solicitation Procedures Order, all notice and service of the Plan, the Disclosure Statement and the Ballots were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to Confirmation) have been given due, proper, timely, and adequate notice in accordance with the Solicitation Procedures Order, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had sufficient opportunity to appear and be heard with respect thereto.

L.    Voting. Holders of Claims in the Voting Classes are Impaired and were entitled to vote to accept or reject the Plan. Under Bankruptcy Code section 1126(f), Debtors were not obligated to solicit votes from Holders of Claims and Interests that are not Impaired and deemed to accept the Plan and, the Court finds that Class 1 and Class 3 are not Impaired under the Plan, and, thus, deemed to have accepted the Plan. Similarly, under Bankruptcy Code section 1126(g), Debtors were not obligated to solicit votes from Holders of Claims and Interests in Classes 7 and 8 because such classes are Impaired and will receive no Distributions and, thus, are conclusively presumed to have rejected this Plan.

M.    Voting Report. On January 24, 2023, the Balloting Declaration was filed (as amended on February 16, 2023), certifying the method and results of the ballot tabulation for Voting Classes. As evidenced by the Balloting Declaration, the Ballots were properly tabulated. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations. Pursuant to Bankruptcy Code sections 1124 and 1126, each of the Voting Classes voted to accept the Plan by the standards of Bankruptcy Code section 1126(c).

N.    Good Faith Solicitation. Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, and all other applicable provisions, rules, and statutes such that this Court finds that Debtors, Debtors' Professionals, and all of their respective directors, officers, employees, members, participants, agents, representatives, partners, affiliates, advisors, and successors or assigns, have acted in good faith within the meaning of Bankruptcy Code sections 1125(e) and 1129(a)(3) and are, thus, entitled to the protections afforded by Bankruptcy Code section 1125(e).

O.    Plan Supplement. All documents contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, and no other or further notice is or shall be required.

P.    Bankruptcy Rule 3016. The Plan and all modifications thereto are dated and identify the Plan Sponsors as plan proponents, thereby satisfying Bankruptcy Rule 3016(a). The Plan Sponsors appropriately filed the Disclosure Statement and Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the

Disclosure Statement and Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c). To the extent of any conflict between the Disclosure Statement, the Plan, and this Confirmation Order, this Confirmation Order controls.

Q.      <u>Bankruptcy Rule 3017</u>. The Plan Sponsors provided proper and sufficient notice of the Confirmation Hearing as required by Bankruptcy Rule 3017(d).

R.      <u>Compliance with the Bankruptcy Code section 1129(a)</u>. The evidentiary record at the Confirmation Hearing, the Confirmation Declaration, the contents of the Plan and the Disclosure Statement, the Solicitation Certificate, the Confirmation Brief, and the Court's judicial notice of the complete record of these Chapter 11 Cases support the findings of fact and conclusions of law set forth herein, including that the Plan Sponsors have satisfied, and the Plan complies with, all applicable subsections of Bankruptcy Code section 1129(a), other than Bankruptcy Code section 1129(a)(8), as explained in the Confirmation Declaration.

S.      <u>Compliance with Bankruptcy Code section 1129(a)(1)</u>. The Plan complies with Bankruptcy Code section 1129(a)(1) as the Plan complies with all applicable provisions of the Bankruptcy Code.

1.      <u>11 U.S.C. §§ 1122, 1123(a)(1); Proper Classification of Claims</u>. The Plan adequately and properly identifies and classifies all Claims and Interests. Pursuant to 11 U.S.C. § 1122(a), the Claims and Interests placed in each Class are substantially similar to other Claims and Interests in each such Class. Pursuant to 11 U.S.C. § 1123(a)(1), valid legal and business reasons exist for the various classes of Claims and Interests under the Plan and such classification does not unfairly discriminate among Holders of Claims and Interests. The Plan's classification of Claims and Interests is reasonable.

2.      <u>11 U.S.C. § 1123(a)(2); Specified Unimpaired Classes</u>. The Plan complies with Bankruptcy Code section 1123(a)(2) by specifying all classes or Claims or Interests that are not Impaired under the Plan.

3.      <u>11 U.S.C. § 1123(a)(3); Specified Treatment of Impaired Classes</u>. The Plan complies with Bankruptcy Code section 1123(a)(3) by specifying the treatment of all classes of Claims or Interests that are Impaired under the Plan.

4.      <u>11 U.S.C. § 1123(a)(4); No Discrimination</u>. The Plan complies with Bankruptcy Code section 1123(a)(4) by providing for equal treatment of Claims or Interests in each respective Class, unless the holder of a Claim or Interest agrees to less favorable treatment on account of such Claim or Interest in such Class.

5.      <u>11 U.S.C. § 1123(a)(5); Implementation of the Plan</u>. In accordance with Bankruptcy Code section 1123(a)(5), Section 4 of the Plan, in conjunction with the Plan Supplement documents, provides adequate means for implementation, including, without limitation, (i) establishing a Litigation Trust to prosecute and liquidate the Litigation Trust Assets for the benefit of holders of Litigation Trust Interests, pursuant to the Litigation Trust Agreement and, with respect thereto, appointing the Litigation Trustee, (ii) establishing the Residents Trust to receive and distribute the Lifespace Resident Contributions pursuant to the terms of the Settlement (as defined below), the Plan and the Residents Trust Agreement for the benefit of holders of Residents Trust Interests and, with respect thereto, appointing the Residents Trust Trustee; (iii) the Sale Transaction; (iv) providing for the return of funds deposited into the Entrance Fee Escrow to satisfy Escrow Resident Claims; and (v) performance in accordance with the Property Condition Cure

Order, Pecuniary Damages Order, and this Confirmation Order (collectively, the "**Plan Implementation Orders**").

6.        11 U.S.C. § 1123(a)(6); Non-Voting Equity Securities. Bankruptcy Code section 1123(a)(6) is not applicable because the Plan does not provide for the issuance of non-voting equity securities.

7.        11 U.S.C. § 1123(a)(7); Designation of Directors and Officers. The Plan provides that within ten (10) days prior to the Effective Date, the Plan Sponsors shall provide notice of the Litigation Trustee and the Litigation Oversight Committee. Consistent with the terms of the Litigation Trust Agreement, the Litigation Trustee shall, among other things, be responsible for making Plan Distributions, which is consistent with the interests of creditors and with public policy. Additionally, the selection of the Litigation Trustee and the Residents Trust Trustee will be consistent with the interests of the holders of the Litigation Trust Interests and the Residents Trust Interests, respectively. The Plan therefore complies with Bankruptcy Code section 1123(a)(7).

8.        11 U.S.C. § 1123(a)(8); No Debtor is an Individual. Neither of the Debtors is an individual (as defined by the Bankruptcy Code). Accordingly, Bankruptcy Code section 1123(a)(8) is inapplicable.

9.        11 U.S.C. § 1123(b)(1); Impairment/Unimpairment of Classes. As stated above, the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving others unimpaired. As contemplated by Bankruptcy Code section 1123(b)(1) and pursuant to Bankruptcy Code section 1124, Section 3 of the Plan classifies and describes the treatment of unimpaired and impaired Classes.

10.    <u>11 U.S.C. § 1123(b)(2); Assumption and Rejection of Executory Contracts and Unexpired Leases.</u> In accordance with Bankruptcy Code section 1123(b)(2), upon entry of the Confirmation Order, Debtors will be conclusively deemed to have rejected, as of the Closing Date, all Executory Contracts and Unexpired Leases not assumed and assigned under the Asset Purchase Agreement (as defined below) or otherwise expressly assumed by separate order of the Court. For the avoidance of doubt, all Residency Agreements shall be deemed rejected and the Ground Lease shall be assumed on the Closing Date in accordance with the terms of the Asset Purchase Agreement and applicable separate order(s) of this Court, including the Plan Implementation Orders.

11.    <u>11 U.S.C. § 1123(b)(3); Preservation of Claims and Causes of Action</u>. In accordance with Bankruptcy Code section 1123(b), Section 4.7 of the Plan provides that unless a Cause of Action has been expressly released, the Litigation Trustee shall be vested with the authority to enforce all rights to commence and pursue any and all Causes of Action of the Debtors, including, without limitation, the Landlord Litigation, whether arising before or after the Petition Date, and the Litigation Trustee's rights shall be consistent with the terms of the Litigation Trust Agreement.

12.    <u>11 U.S.C. § 1123(b)(6); Releases, Injunction, Exculpation</u>. Pursuant to Bankruptcy Rule 3016(c), the Plan describes in specific and conspicuous language all acts to be enjoined by, and identifies the entities that are subject to releases and injunctions provided under, the Plan, including without limitation, Section 8 thereof. The Court finds that each release, exculpation, and injunction provision set forth in the Plan is: (a) within the jurisdiction of the Court under 28 U.S.C. §§ 1334; (b) essential to the implementation of the Plan pursuant to Bankruptcy Code section 1123(a)(5) and warranted by the

circumstances of the Chapter 11 Cases; (c) an integral element of the Plan; (d) the product

of an arms-length transaction and a critical element of obtaining the support of the various

constituencies for Plan support; (e) fair, equitable, and in the best interests of Debtors'

estates and creditors; (f) important to the overall objectives of the Plan, including without

limitation, to finally resolve claims against or among key parties in the Chapter 11 Cases;

and (g) consistent with Bankruptcy Code sections 105, 1123, and 1129, and other

applicable provisions of the Bankruptcy Code. Notwithstanding the foregoing, nothing in

this Confirmation Order or the Plan shall be construed to release, waive, impair or enjoin

any claim for indemnification by Landlord under the Ground Lease and any claims that

may be made under or against Debtors' available insurance coverage for covered events

and occurrences prior to the Closing Date (the "**Reserved Unknown Insurance Claims**")

pending an agreement between the parties or further proceedings before this Court, to be

the subject of a supplemental order, solely resolving the potential post-Closing Date

treatment of any Reserved Unknown Insurance Claims; *provided, however*, that that this

provision does not limit or restrict the finality of this Confirmation Order, consistent with

paragraph 64 below, and should not be interpreted as an admission, release and/or waiver

of any rights by or of the Plan Sponsors.

     13.     <u>11 U.S.C. § 1123(d); Cure of Defaults</u>. Section 5 of the Plan provides for

the satisfaction of cure obligations, which are the Cure Amounts and the Ground Lease

Cure (each of which shall have the meaning used in the Asset Purchase Agreement for

purposes of this Confirmation Order), with respect to Executory Contracts and Unexpired

Leases to be assumed and assigned by the Debtors in accordance with Bankruptcy Code

section 365(b)(1) and 1123(d) and applicable separate order(s) of this Court, including the Property Condition Cure Ruling and the Pecuniary Damages Ruling.

T.     Compliance with Bankruptcy Code section 1129(a)(2). The Plan Sponsors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and other applicable law in transmitting the Plan, the Disclosure Statement, the Plan Supplement, the Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(2).

U.     Compliance with Bankruptcy Code section 1129(a)(3). The Plan Sponsors have proposed the Plan and the Plan Supplement and all documents necessary to effectuate the Plan in good faith and not by any means forbidden by law, and, the Plan Sponsors have satisfied the good faith requirement under Bankruptcy Code section 1129(a)(3). The Plan Sponsors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' assets and distributions to creditors. The Plan and the contracts, instruments, releases, agreements and documents necessary and related to implementing, effectuating and consummating the Plan, including, without limitation, the Sale Transaction, is the culmination of extensive good-faith, arm's-length negotiations. Further, the Plan's classification, exculpation, release, and injunction provisions are consistent with Bankruptcy Code sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 and applicable case law in the Fifth Circuit, have been negotiated in good faith and at arms' length, are integral to the Plan, and supported by valuable consideration.

15

V. <u>Compliance with Bankruptcy Code section 1129(a)(4)</u>. Any payment made or to be made by the Debtors, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, and, thus, the Plan complies with Bankruptcy Code section 1129(a)(4).

W. <u>Compliance with Bankruptcy Code section 1129(a)(5)</u>. The Debtors are liquidating pursuant to the Plan, which provides for the appointment of the Litigation Trustee and the Residents Trust Trustee to serve as of and after the Effective Date. Thus, the Plan complies with Bankruptcy Code section 1129(a)(5).

X. <u>Compliance with Bankruptcy Code section 1129(a)(6)</u>. The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction. Accordingly, Bankruptcy Code section 1129(a)(6) is not applicable to these Chapter 11 Cases.

Y. <u>Compliance with Bankruptcy Code section 1129(a)(7)</u>. The Plan Sponsors' evidence, including the Liquidation Analysis attached as Exhibit 2 to the Disclosure Statement and the Fields Declaration, demonstrates that each Class under the Plan is receiving not less than such Class would have received if the Debtors had liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, the Plan complies with Bankruptcy Code section 1129(a)(7).

Z. <u>Bankruptcy Code section 1129(a)(8)</u>. As evidenced in the Balloting Declaration, all Voting Classes voted to accept the Plan. Class 1 (Other Priority Claims) and Class 3 (Other Secured Claims) are unimpaired and conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f), while Class 7 (Intercompany Claims) and 8 (Interests in Debtors), are deemed to have rejected the Plan under Bankruptcy Code section 1126(g). Thus, the Plan Sponsors request Confirmation under Bankruptcy Code section 1129(b), not section 1129(a),

which would require all impaired Classes to accept the Plan. Because the Plan does not discriminate unfairly and is fair and equitable with respect to Classes 7 and 8, the requirements of Bankruptcy Code section 1129(a)(8) need not be satisfied because the requirements of Bankruptcy Code section 1129(b) has been satisfied.

AA.    Compliance with Bankruptcy Code section 1129(a)(9). The treatment of Claims under the Plan of the type specified in Bankruptcy Code section 507(a)(1) through 507(a)(8), if any, complies with the provisions of Bankruptcy Code section 1129(a)(9).

BB.    Compliance with Bankruptcy Code section 1129(a)(10). As evidenced by the Balloting Declaration, Bankruptcy Code section 1129(a)(10) is satisfied because the accepting Classes have accepted the Plan, determined without including any acceptances of the Plan by any insider of the Debtors.

CC.    Compliance with Bankruptcy Code section 1129(a)(11). The information contained in the Disclosure Statement, the Plan Supplement, the Confirmation Declaration, the Fields Declaration, and the evidence proffered or adduced at or prior to the Confirmation Hearing (i) is reasonable, persuasive and credible; (ii) has not been controverted by other evidence; and (iii) establishes that the Plan is feasible and that there is a reasonable prospect that the Debtors are able to meet their financial obligations under the Plan and that Confirmation is not likely to be followed by the liquidation of the Debtors, other than as set forth in the Plan itself, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(11).

DD.    Compliance with Bankruptcy Code section 1129(a)(12). All fees payable under section 1930 of Title 28 of the United States Code have either been paid or will be paid under the Plan by the Effective Date, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(12).

EE.    <u>Compliance with Bankruptcy Code section 1129(a)(13).</u> The Debtors do not owe retiree benefits, therefore, Bankruptcy Code section 1129(a)(13) is inapplicable.

FF.    <u>Bankruptcy Code section 1129(a)(14)-(15).</u> Bankruptcy Code sections 1129(a)(14) and (a)(15) are not applicable in these Chapter 11 Cases as the Debtors do not owe any domestic support obligations and are not individuals.

GG.    <u>Compliance with Bankruptcy Code section 1129(a)(16).</u> Any and all transfers of property contemplated under the Plan shall be made in accordance with any applicable provisions of non-bankruptcy law. Accordingly, Bankruptcy Code section 1129(a)(16) has been satisfied.

HH.    <u>Compliance with Bankruptcy Code section 1129(b).</u> Based upon the evidence proffered, adduced, and presented by the Plan Sponsors at the Confirmation Hearing and in the Confirmation Declaration, the Plan does not discriminate unfairly and is fair and equitable with respect to the Classes that are deemed to have rejected the Plan as required by Bankruptcy Code sections 1129(b)(1) and (b)(2) , because no Holder of any Claim or Interest that is junior to such Classes will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Holder of a Claim in a Class senior to such Classes is receiving more than 100% recovery on account of its Claim. Thus, the Plan may be confirmed notwithstanding the deemed rejection of the Plan by Classes 3, 7, and 8.

II.    <u>Compliance with Bankruptcy Code section 1129(c)</u>. Other than the Plan (including previous versions thereof), no other plan is being proposed for Confirmation in these Chapter 11 Cases. As a result, Plan Sponsors have satisfied the requirements of Bankruptcy Code section 1129(c).

JJ.    <u>Compliance with Bankruptcy Code section 1129(d).</u> The Debtors have not proposed the Plan to avoid taxes or the application of section 5 of the Securities Act of 1933, as

amended, and no governmental unit has filed any pleading asserting any attempted avoidance thereof. The Plan, thus, satisfies the requirements of Bankruptcy Code section 1129(d).

KK.     <u>Bankruptcy Code section 1129(e)</u>. None of these Chapter 11 Cases are "small business cases", as that term is defined in the Bankruptcy Code, and, accordingly, Bankruptcy Code section 1129(e) is inapplicable.

LL.     <u>No Material Plan Modifications</u>. The Court finds and concludes that any modifications to the Plan set forth in this Confirmation Order or otherwise (collectively, the "**Plan Modifications**") do not have any material adverse impact on any interested party and are appropriate under the circumstances. Accordingly, the Plan Modifications comply in all respects with Bankruptcy Code section 1127 and Bankruptcy Rule 3019, and none of the Plan Modifications requires additional disclosure or resolicitation of votes. Under Bankruptcy Rule 3019(a), all creditors that previously accepted the Plan are deemed to have accepted the Plan as modified. The Plan as modified shall constitute the Plan submitted for Confirmation.

MM.     <u>Settlement of Claims and Compromises</u>. The Court finds that the Lifespace Settlement and Contribution Agreement, dated December 9, 2022 (as amended pursuant to that certain First Amended and Restated Settlement and Contribution Agreement, in substantially the form as attached hereto as **Exhibit 1** hereto, the "**Settlement**"), contained in the Plan and the Disclosure Statement is reasonable and appropriate under the circumstances of the Chapter 11 Cases and satisfies Bankruptcy Code section 1123 and Bankruptcy Rule 9019. The entry of this Confirmation Order shall constitute approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their estates, and holders of Claims and Interests and is fair, equitable, and reasonable. After the Effective Date, the Residents Trust Trustee and the Litigation

Trustee, as applicable, may, and shall have the right to, compromise and settle any Claims against the Debtors and Causes of Action.

NN.     <u>Plan Proposed in Good Faith</u>. The Plan Sponsors have been acting in good faith and will be acting in good faith if they proceed to: (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated therein and thereby, including the Sale Transaction; and (ii) take actions authorized and directed by this Confirmation Order.

OO.     <u>Approval of Litigation Trust Agreement</u>. The Litigation Trust Agreement, in substantially the form as filed with the Plan Supplement, is hereby approved, and the Litigation Trust Assets shall be transferred to, and vest in, the Litigation Trust on the Effective Date. The Litigation Trustee shall have the powers, rights, duties, obligations, discretion and privileges set forth in the Plan and the Litigation Trust Agreement. The Litigation Trustee and the Debtors are hereby authorized to enter into the Litigation Trust Agreement, in substantially the form as filed with the Plan Supplement, and the terms thereof are hereby fully incorporated into this Confirmation Order by reference as if fully set forth herein.

PP.     <u>Appointment of Litigation Trustee</u>. Ten (10) days prior to the Effective Date, the Litigation Trustee shall be appointed for the purposes of (i) liquidating any non-Cash Litigation Trust Assets, (ii) maximizing recovery of the Litigation Trust Assets for the benefit of holders of the Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement approved herein, (iii) distributing the proceeds of the Litigation Trust Assets to holders of the Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement approved herein, (iv) prosecuting or otherwise resolving the Retained Causes of Action, including the Landlord Litigation, and (v) winding down the Chapter 11 Cases.

QQ.    <u>Approval of Residents Trust Agreement</u>. The Residents Trust Agreement, in substantially the form as attached hereto as **Exhibit 2**, is hereby approved, and the Residents Trust Assets shall be transferred to, and vest in, the Residents Trust on the Effective Date. The Residents Trust Trustee shall have the powers, rights, duties, obligations, discretion and privileges set forth in the Plan and the Residents Trust Agreement. The Residents Trust Trustee and the Debtors are hereby authorized to enter into the Residents Trust Agreement, and the terms thereof are hereby fully incorporated into this Confirmation Order by reference as if fully set forth herein. On or before the Effective Date, the Debtors are hereby authorized and directed to transfer information deemed reasonably necessary by the Trustee of the Residents Trust to fulfill his or her duties and obligations under the Residents Trust Agreement including, but not limited to, Residents names, addresses, current level of care being provided, entrance fee deposit amounts as of the Effective Date, copies of existing residency agreements, amounts of life care benefits as of the Effective Date, if any, being provided to each Current Resident under their existing Life Care Agreements with the Debtors, and other information deemed reasonably necessary by the Trustee to  fulfill his or her duties and obligations under the Residents Trust Agreement. The Trustee and its agents, professionals and advisors shall keep all non-public information relating to each individual Resident confidential pursuant to the provisions of Section 9.10 of the Residents Trust Agreement and shall use such non-public information solely for carrying out its duties under the Resident Trust Agreement.

RR.    <u>Appointment of Residents Trust Trustee</u>. Ten (10) days prior to the Effective Date, the Residents Trust Trustee shall be appointed for the purposes of (i) receiving the Residents Trust Assets vesting with the Residents Trust in accordance with the provisions of the Residents Trust Agreement approved herein; and (ii) distributing the proceeds thereof to Participating Former

Residents and Participating Current Residents in accordance with the provisions of the Residents

Trust Agreement, the Settlement, the Plan, and this Confirmation Order.

SS. <u>Sale Transaction Provisions</u>.

1. The Debtors have, to the extent necessary or applicable, (a) the full

corporate power and authority to execute and deliver the Asset Purchase Agreement, dated

as of December 16, 2022, by and between the Debtors and the Purchaser, as amended by

the certain (i) First Amendment to Asset Purchase Agreement, dated as of January 13,

2023, and (ii) Second Amendment to Asset Purchase Agreement, dated as of March 6,

2023 (collectively, as amended, the "**Asset Purchase Agreement**") and all other

documents contemplated thereby, (b) all corporate authority necessary to consummate the

transactions contemplated by the Asset Purchase Agreement, and (c) taken all corporate

action necessary to authorize and approve the Asset Purchase Agreement and the

consummation of the transactions contemplated thereby. The Sale Transaction has been

duly and validly authorized by all necessary corporate action. No internal consents or

approvals, other than those expressly provided for in the Asset Purchase Agreement, are

required for the Debtors to consummate the Sale Transaction, the Asset Purchase

Agreement, or the transactions contemplated thereby, other than regulatory approvals

required under applicable Texas law.

2. Actual written notice of the Sale Transaction, the Auction, the Confirmation

and Sale Hearing, and the transactions contemplated thereby, and a reasonable opportunity

to object or be heard with respect thereto and the relief requested therein, has been afforded

to all known interested entities and parties, including, without limitation, the following

entities and parties: (a) the U.S. Trustee; (b) UMB Bank, N.A. as Trustee and DIP Lender;

(c) the counterparties to the Executory Contracts, including, for the avoidance of doubt, the

Landlord; (d) all parties who have expressed a written interest in the Assets; (e) all parties

who are known or reasonably believed, after reasonable inquiry, to have asserted any lien,

encumbrance, claim, or interest in the Assets; (f) the Internal Revenue Service; (g) all other

applicable state and local taxing authorities; (h) all Residents with known claims against

the Debtors; (i) the Debtors' other creditors; (j) each governmental agency that is an

interested party with respect to the Sale Transaction and transactions proposed thereunder;

and (k) all parties that have requested or that are required to receive notice pursuant to

Bankruptcy Rule 2002.

3.     The notices regarding the Sale Transaction, the Auction and the

Confirmation and Sale Hearing provided all creditors and other interested parties with

timely and proper notice of the Sale Transaction, the Auction, and the Confirmation and

Sale Hearing.

4.     As evidenced by the affidavits of service and affidavits of publication

previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale

Transaction, the Auction, the Confirmation and Sale Hearing, and the transactions

contemplated thereby, including, without limitation, the assumption and assignment of the

Assumed Contracts (which shall have the meaning used in the Asset Purchase Agreement

for purposes of this Confirmation Order) assumed and assigned to Purchaser, has been

provided in accordance with the Bidding Procedures Order, Bankruptcy Code sections

105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014. The

notices described herein were good, sufficient, and appropriate under the circumstances,

and no other or further notice of the Sale, the Auction, the Confirmation and Sale Hearing,

or the assumption and assignment of the Assumed Contracts to Purchaser is or shall be required.

5.    A reasonable opportunity to object and be heard with respect to the Sale Transaction, and the relief requested therein (including, without limitation, the assumption and assignment of the Assumed Contracts to Purchaser and any Cure Amounts and the Ground Lease Cure), has been afforded to all interested persons and entities.

6.    The Auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Assets. The Auction was duly noticed and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Assets. Except for the Purchaser's Qualified Bid, the Plan Sponsors did not receive any Qualified Bids prior to the Bid Deadline. Accordingly, pursuant to the Bidding Procedures Order, the Auction was canceled and the Purchaser was properly determined to be the Successful Bidder.

7.    As demonstrated by the representations of counsel and other evidence proffered or adduced at the Confirmation and Sale Hearing, the Plan Sponsors and their advisors marketed the Assets to secure the highest and best offer. The terms and conditions set forth in the Asset Purchase Agreement are fair, adequate, and reasonable, including the amount of the purchase price, which is found to constitute reasonably equivalent and fair value.

8.    The Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31). No officer, director, manager, or other insider of the Debtors holds any interest in or is otherwise related to Purchaser.

9.      The Plan Sponsors and Purchaser extensively negotiated the terms and conditions of the Asset Purchase Agreement in good faith and at arm's length. Purchaser is purchasing the Purchased Assets (which shall have the meaning used in the Asset Purchase Agreement for purposes of this Confirmation Order) and has entered into the Asset Purchase Agreement in good faith and is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, inter alia: (i) Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Purchased Assets; (ii) Purchaser agreed to subject its bid to competitive bidding; (iii) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale Transaction have been disclosed; (iv) Purchaser has not violated Bankruptcy Code section 363(n) by any action or inaction; (v) no common identity of directors or controlling stockholders exists between Purchaser and the Debtors; and (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's length and in good faith.

10.     Neither the Plan Sponsors nor Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under Bankruptcy Code section 363(n). The Plan Sponsors and Purchaser were represented by their own respective counsel and other advisors during such arm's length negotiations in connection with the Asset Purchase Agreement and the Sale Transaction.

11.     No party has objected to the Sale Transaction, the Asset Purchase Agreement or the Auction on grounds of fraud or collusion. To the extent the Landlord asserted any objection to the Sale Transaction, the Asset Purchase Agreement or the

Auction on grounds of fraud or collusion, the Court finds no merit to any such arguments and any such objections are overruled.

12.     Accordingly, Purchaser is purchasing the Purchased Assets in good faith and is a good-faith buyer within the meaning of Bankruptcy Code section 363(m). Purchaser is therefore entitled to all of the protections afforded under Bankruptcy Code section 363(m).

13.     The Plan Sponsors conducted a sale process in accordance with, and has otherwise complied fully in all respects with, the Bidding Procedures Order. The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets. The Auction was duly noticed in a non-collusive, fair, and good-faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Assets.

14.     The Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

15.     The Asset Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of the Chapter 11 Cases. No other entity or group of entities has offered to purchase the Assets and assume liabilities for greater overall value to the Debtors' estates than Purchaser.

16.     Approval of the Asset Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors' estates, their creditors, and other parties in interest.

17.     The Debtors have demonstrated compelling circumstances and a good, sufficient, prudent and sound business purpose and justification for the Sale Transaction as part of a plan of reorganization.

18.     The consideration provided by Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Purchased Assets, and (c) constitutes reasonably equivalent value (as defined in each of the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, Bankruptcy Code section 548, and under the laws of the United States, any state, territory, possession, or the District of Columbia).

19.     Purchaser is an independent legal entity separate and distinct from the Debtors. There are no common equity holders, directors, managers or officers. The Debtors will be liquidating and the Purchaser will continue to exist following the Closing Date. Neither the Purchaser nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, general partners, limited partners, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (each, a "**Purchaser Party**") is a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between any Purchaser Party and the Debtors. No Purchaser Party is holding itself out to the public as a continuation of the Debtors. No Purchaser Party

is a successor to the Debtors or their estates, and the Sale Transaction is not a consolidation, merger, or de facto merger of Purchaser and the Debtors under applicable non-bankruptcy law.

20.    The consummation of the Sale Transaction and other transactions contemplated by the Asset Purchase Agreement do not constitute a fraudulent or avoidable transfer of the Purchased Assets under the Bankruptcy Code or under the laws of the United States, any of its states, territories, or possessions, or the District of Columbia. Among other things, the Asset Purchase Agreement was entered into openly and in accordance with the Bankruptcy Code and was not entered into for the purpose of hindering, delaying, or defrauding creditors. Neither the Debtors nor Purchaser are entering into the transactions contemplated by the Asset Purchase Agreement fraudulently or for the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims.

21.    Subject to Bankruptcy Code section 363(f) (addressed below), and subject to the Plan Implementation Orders, and except only for Permitted Liens and Assumed Liabilities (each of which shall have the meaning used in the Asset Purchase Agreement for purposes of this Confirmation Order), the transfer of the Purchased Assets to Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any Claims, Liens and Encumbrances (each of which shall have the meaning used in the Asset Purchase Agreement for purposes of this Confirmation Order) with such Claims, Liens and Encumbrances attaching to the proceeds of the sale to the same validity, priority and extent as existed prior to such sale, including, without limitation: (a) all Liens and Encumbrances relating to, accruing, or arising at any

time prior to the Closing Date, including but not limited to mechanics and other statutory

Liens; and (b) all Liabilities (which shall have the meaning used in the Asset Purchase

Agreement for purposes of this Confirmation Order) including, without limitation: debts

arising under, relating to, or in connection with any act of the Debtors or any Claims,

obligations, demands, guarantees, options in favor of third parties, rights, contractual

commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan

agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trusts,

security interests or similar interests, conditional sale or other title retention agreements

and other similar impositions, restrictions on transfer or use, pledges, judgments, claims

for reimbursement, contribution, indemnity, exoneration, infringement, products liability,

alter ego liability, suits, defenses, credits, allowances, options, limitations, causes of action,

choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return,

proxy, voting trust or agreement or transfer restriction under any shareholder or similar

agreement or encumbrance, easements, rights of way, encroachments, and matters of any

kind and nature, whether arising prior to or subsequent to the Petition Date, whether known

or unknown, legal or equitable, mature or unmatured, contingent or noncontingent,

liquidated or unliquidated, asserted or unasserted, whether imposed by agreement,

understanding, law, equity, or otherwise (including, without limitation, rights with respect

to claims  and Liens (A) that purport to give any party a right or option to effect a setoff or

recoupment against, or a right or option to effect any forfeiture, modification, profit sharing

interest, right of first refusal, purchase or repurchase right or option, or termination of, any

of the Debtors' or the Purchaser's interests in the Purchased Assets, or any similar rights,

if any, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of

any kind or nature, if any, including without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership).

22.     For the avoidance of doubt, the terms "Liens" and "Claims," as used in this Confirmation Order, include, without limitation, rights with respect to any Liens and Claims:

a.     that purport to give any party a right of setoff or recoupment against, or a right or option to affect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase writer option, or termination of, any of the Debtors' or Purchaser's interest in the Purchased Assets, or any similar rights; or

b.     in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the Closing Date, with the sole exception of Permitted Liens and Assumed Liabilities that are expressly assumed by Purchaser pursuant to the Asset Purchase Agreement.

23.     The conditions of Bankruptcy Code section 363(f) have been satisfied in full; therefore, the Debtors may sell the Purchased Assets free and clear of any Claims, Liens and Encumbrances in the property other than any Permitted Liens and Assumed Liabilities, subject to the terms of the Asset Purchase Agreement.

24.     Purchaser would not have entered into the Asset Purchase Agreement, and would not consummate the transactions contemplated thereby, if the sale of the Purchased Assets to Purchaser and the assumption of the Assumed Liabilities by Purchaser if the Purchased Assets were not free and clear of all Claims, Liens and Encumbrances, other

than Permitted Liens and the Assumed Liabilities, or if Purchaser would, or in the future

could, be liable for any of such Claims, Liens and Encumbrances (other than the Permitted

Liens and the Assumed Liabilities). Unless otherwise expressly included in the Permitted

Liens, Assumed Contracts, or the Assumed Liabilities, Purchaser shall not be responsible

for any Claims, Liens and Encumbrances against the Debtors, their estates, or any of the

Assets, including in respect of the following: (a) any labor or employment agreement; (b)

any and all mortgages, deeds of trust, and other security interests, liens, attachments and

other encumbrances, including but not limited to mechanics and other statutory Liens; (c)

intercompany loans and receivables among the Debtors and any of their affiliates (as

defined in Bankruptcy Code section 101(2)); (d) any other environmental, employee,

workers' compensation, occupational disease, or unemployment or temporary disability-

related claim, including, without limitation, claims that might otherwise arise under or

pursuant to: (i) the Employee Retirement Income Security Act of 1974, as amended; (ii)

the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal

Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker

Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination and

Employee Act of 1967 and the Age Discrimination in Employment Act, as amended; (viii)

the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget

Reconciliation Act of 1985; (x) state discrimination laws; (xi) the unemployment

compensation laws or any other similar state laws; or (xii) any other state or federal benefits

or claims relating to any employment with the Debtors or their predecessors, if any; (xiii)

Claims or Liens arising under any environmental law with respect to the Debtors' business,

Excluded Liabilities (as defined in the Asset Purchase Agreement), the Assets, the

Excluded Assets (as defined in the Asset Purchase Agreement), or any assets owned or operated by the Debtors or any corporate predecessor of the Debtors, at any time prior to the Closing Date; (xiv) any bulk sales or similar law; (xv) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xvi) any statutory or common-law bases for successor liability.

25.     The Debtors may sell the Purchased Assets free and clear of all Claims, Liens and Encumbrances in such property of any entity subject to the terms of this Confirmation Order, including, without limitation, any Claims, Liens and Encumbrances against the Debtors, their estates, or any of the Purchased Assets (other than the Permitted Liens and Assumed Liabilities) because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of Claims, Liens and Encumbrances in the Purchased Assets, including, without limitation, holders of Claims, Liens and Encumbrances against the Debtors, their estates, or any of the Purchased Assets, who did not object, or who withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). All other holders of Claims, Liens and Encumbrances (other than Permitted Liens and Assumed Liabilities) are adequately protected by having their Claims, Liens and Encumbrances, if any, in each instance against the Debtors, their estates, or any of the Purchased Assets, attached to the net proceeds of the Sale Transaction received by the Debtors ultimately attributable to the Purchased Assets in which such party alleges a Claim, Lien or Encumbrance, in the same order of priority, with the same validity, force, and effect that such Claim, Lien or Encumbrance had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

26.     The assumption and assignment of the Assumed Contracts pursuant to the
terms of this Confirmation Order and the Asset Purchase Agreement is integral to the Sale
Transaction and is in the best interest of the Debtors and their estates, their creditors, and
all of the parties in interest, and represents the reasonable exercise of sound and prudent
business judgment by the Debtors.

27.     Pursuant to the terms of the Asset Purchase Agreement, Purchaser shall: (a)
to the extent necessary, pay the Cure Amounts with respect to the Assumed Contracts
(other than the Ground Lease), within the meaning of Bankruptcy Code sections
365(b)(1)(A) and 365(f)(2)(A); and (b) to the extent necessary, provide adequate assurance
of compensation to any counterparty to any Assumed Contract (other than the Ground
Lease) for any actual pecuniary loss to such party resulting from a default prior to the date
hereof with respect to the Assumed Contracts, within the meaning of Bankruptcy Code
sections 365(b)(1)(B) and 365(f)(2)(A).

28.     As of the Closing Date, subject only to the payment or escrow of the Cure
Amounts, as determined in accordance with the procedures identified in the Bidding
Procedures Order and the Asset Purchase Agreement, each of the Assumed Contracts
(including the Ground Lease) will be in full force and effect and enforceable by Purchaser
against any counterparty thereto in accordance with its terms and by the counterparty
against the Purchaser.

29.     The Debtors have, to the extent necessary, satisfied the requirements of
Bankruptcy Code sections 365(b)(1) and 365(f) in connection with the Sale Transaction,
the assumption and assignment of the Assumed Contracts (including the Ground Lease),

and shall upon assignment thereto on the Closing Date, be relieved from any liability for any breach thereof.

30.    Incorporating herein by reference the Confirmation and Sale Ruling, the Purchaser has demonstrated that it has the financial wherewithal to fully perform and satisfy the obligations under the Assumed Contracts (including the Ground Lease) as required by Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B). Pursuant to Bankruptcy Code section 365(f)(2)(B), and for the reasons set forth in the Confirmation and Sale Ruling, Purchaser has provided adequate assurance of future performance of the obligations under the Assumed Contracts (including the Ground Lease) pursuant to Bankruptcy Code section 365(f)(2)(B); *provided, however*, (i) Purchaser shall provide Landlord prompt written notice of any failure of its corporate parent to fund a capital commitment pursuant to the Capital Commitment Letter (as defined below) and (ii) that if the Purchaser shall be in default on its rent payments under the Ground Lease during the first three years from the Closing Date, the Purchaser's sponsor shall guaranty rent payments under the Ground Lease solely and exclusively to the extent set forth in "Ordered" paragraph 21 herein.

31.    For the reasons set forth in the Confirmation and Sale Ruling, including (a) Purchaser's promise to pay the Cure Amounts for Assumed Contracts (other than the Ground Lease), (b) the Debtors' promise to pay or escrow the Ground Lease Cure for the Ground Lease as determined by the Court and set forth in the (i) Property Condition Cure Ruling and the Property Condition Cure Order, (ii) the Pecuniary Damages Ruling and the Pecuniary Damages Order, and (c) the Purchaser's promise to perform the obligations under the Assumed Contracts (including the Ground Lease) as set forth in the Asset

Purchase Agreement, constitutes adequate assurance of future performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

32.    The Debtors have demonstrated both (a) good, sufficient, and sound business purposes, reasons and justifications for approving the Asset Purchase Agreement, and (b) compelling circumstances for the sale outside the ordinary course of business, pursuant to Bankruptcy Code section 363(b).

33.    To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Asset Purchase Agreement. Time is of the essence in consummating the Sale Transaction.

34.    The consummation of the Sale Transaction and the assumption and assignment of the Assumed Contracts (including the Ground Lease) is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), and 365, Bankruptcy Rule 6004 and Local Bankruptcy Rule 6004-1 and all of the applicable requirements of such sections and rules have been complied with in all respects.

TT.    <u>Implementation</u>. All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and are in the best interests of the Debtors, and shall, upon completion of documentation and execution, and subject to the occurrence of the Effective Date, be valid, binding, and enforceable agreements and shall not be in conflict with any federal or state law.

UU.     <u>Satisfaction of Condition Precedent to Effective Date</u>. Entry of this Confirmation Order shall satisfy a condition precedent to the Effective Date set forth in Section 9.2 of the Plan.

VV.     <u>Retention of Jurisdiction</u>. Notwithstanding the entry of this Confirmation Order, the occurrence of the Effective Date, or the closing of the Chapter 11 Cases, and without limiting any other retention of jurisdiction set forth in this Confirmation Order, pursuant to Bankruptcy Code sections 105 and 1142, the Court, except as otherwise explicitly provided in the Plan or this Confirmation Order, shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent permitted by law, including, but not limited to, jurisdiction over the matters set forth in Section 11 of the Plan.

WW.     <u>Requirements for Confirmation Are Satisfied</u>. The Plan Sponsors have satisfied the requirements for Confirmation of the Plan under Bankruptcy Code section 1129. Confirmation of the Plan is in the best interests of Debtors' estates, Debtors' creditors, and all other parties in interest.

## ORDER

**Now, THEREFORE, in view of the foregoing FINDINGS, it is hereby ORDERED, ADJUDGED, and DECREED as follows:**

1.     <u>Findings of Fact and Conclusions of Law</u>. The above-referenced findings of fact and conclusions of law, together with the Confirmation and Sale Ruling, are hereby incorporated by reference as though more fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2.      <u>Notice of Confirmation Hearing</u>. Notice of the Confirmation Hearing was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

3.      <u>Solicitation and Tabulation</u>. The solicitation and tabulation of votes on the Plan was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

4.      <u>Plan Modifications</u>. The modifications and amendments to the Plan through the date hereof, including the Plan Modifications described herein, meet the requirements of Bankruptcy Code section 1127(a) and (c), such modifications do not materially and adversely affect the treatment of the Claim of any Creditor of Interest Holder within the meaning of Bankruptcy Rule 3019(a), and no further solicitation or voting is required. The Plan is hereby amended to include the Plan Modifications described herein.

5.      <u>Omission of Reference to Plan Provision(s)</u>. The failure to specifically describe or include any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

6.      <u>Plan Confirmation</u>. The Plan as modified by this Confirmation Order is hereby CONFIRMED in its entirety under Bankruptcy Code section 1129. The documents contained in or contemplated by the Plan, including without limitation, the Plan Supplement, are hereby authorized and approved. The terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.

7.      <u>Provisions of Plan Nonseverable and Mutually Dependent</u>. The provisions of the

Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth

herein, are: (a) non-severable and mutually dependent; (b) valid and enforceable pursuant to their

terms; and (c) integral to the Plan and this Confirmation Order and may not be deleted or modified

except in accordance with Section 10.1 of the Plan.

8.      <u>Plan Implementation</u>. In accordance with Bankruptcy Code section 1142, no further

action by the Court or the member, managers, officers, or directors of the Debtors is required for

the Debtors to, as of the Effective Date, (a) take any and all actions necessary or appropriate to

implement, effectuate, and consummate the Plan, the Sale Transaction, this Confirmation Order,

and any and all related transactions contemplated thereby or hereby, and (b) execute and deliver,

adopt or amend, as the case may be, any contracts, instruments, releases, agreements, and

documents necessary to implement, effectuate, and consummate the Plan and the Sale Transaction.

9.      <u>Sale Transaction</u>. The Asset Purchase Agreement and all other ancillary documents,

and all of the terms and conditions thereof, are hereby approved. Pursuant to Bankruptcy Code

sections 363(b) and (f), the Debtors are authorized, empowered, and directed to use their

reasonable best efforts to take any and all actions necessary or appropriate to (a) consummate the

Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase

Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement and

this Confirmation Order, and (c) execute and deliver, perform under, consummate, implement, and

fully close the Asset Purchase Agreement, including the assumption and assignment to Purchaser

of the Assumed Contracts (including the Ground Lease), in accordance with the procedures set

forth in the Asset Purchase Agreement (including but not limited to Section 8.2 therein), together

with additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

10.    <u>Transfer of Purchased Assets</u>. Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtors are authorized and directed to transfer the Purchased Assets, excluding the Cure Escrow, Litigation Trust Assets and the Residents Trust Assets, to Purchaser on or as soon as reasonably practicable after the Closing Date in accordance with the terms of the Asset Purchase Agreement, and such transfer shall constitute a legal, valid, binding, and effective transfer of the Purchased Assets and shall vest Purchaser with title to the Purchased Assets.

11.    <u>Surrender of Purchased Assets by Third Parties</u>. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to Purchaser or its assignee on the Closing Date. On the Closing Date, except only for Permitted Liens and Assumed Liabilities, each of the Debtors' creditors are authorized and directed to execute such documents and take such other actions as may be reasonably necessary to release their Claims, Liens and Encumbrances in the Purchased Assets, if any, as such Claims, Liens and Encumbrances may have been recorded or may otherwise exist with such Claims, Liens and Encumbrances attaching to the Sale Transaction proceeds in the same validity, priority and extent that existed prior to the Closing Date. All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

12.    <u>Transfer Free and Clear of Claims, Liens and Encumbrances</u>. Upon the Debtors' receipt of the net sale proceeds from the Sale Transaction, and other than Permitted Liens and Assumed Liabilities specifically set forth in the Asset Purchase Agreement, the transfer of the

Purchased Assets to Purchaser shall be free and clear of all Claims, Liens and Encumbrances of any kind or nature whatsoever, including, without limitation, (a) successor or successor-in-interest liability, (b) Claims in respect of the Excluded Liabilities, and (c) any and all Executory Contracts and Unexpired Leases not assumed and assigned to Purchaser pursuant to the terms of the Asset Purchase Agreement, with all such Claims, Liens and Encumbrances to attach to the net proceeds received by the Debtors ultimately attributable to the Purchased Assets against, or in, which such Claims, Liens and Encumbrances are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Claims, Liens and Encumbrances now have against the Purchased Assets. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens and Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the Sale in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all Liens and Encumbrances that the person or entity has with respect to the Purchased Assets, then with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Asset Purchase Agreement and this Confirmation Order, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets.

13.    <u>Legal, Valid, and Marketable Transfer with Permanent Injunction</u>. The transfer of the Purchased Assets to Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of good and marketable title of the Purchased Assets, and vests, or will vest, Purchaser with all right, title, and interest to the Purchased Assets, free and clear of all Claims, Liens and Encumbrances except for Permitted Liens and Assumed Liabilities under the Asset

Purchase Agreement. All Persons holding Claims, Liens and Encumbrances of any kind or nature whatsoever against the Debtors or the Purchased Assets, the operation of the Purchased Assets prior to the Closing Date, or the Sale Transaction are hereby and forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property, or the Purchased Assets, any claim, interest or liability existing, accrued, or arising prior to the Closing Date other than with respect to Permitted Liens, Assumed Liabilities and Assumed Contracts.

14.    <u>Recording Offices and Releases of Claims, Liens and Encumbrances</u>. On the Closing Date, this Confirmation Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Purchased Assets or a bill of sale transferring good and marketable title of the Purchased Assets to Purchaser subject to the terms hereof and the Asset Purchase Agreement. This Confirmation Order is and shall be effective as a determination that, on the Closing Date, all Claims, Liens and Encumbrances of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, other than Permitted Liens, Assumed Contracts, and Assumed Liabilities shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected. This Confirmation Order is and shall be binding upon and govern the acts of the Debtors, the Purchaser, all creditors and other parties in interest and all other persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, clerks of courts, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any lease; and each of the foregoing persons is

hereby directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. Each

and every federal, state, and local governmental agency or department is hereby directed to accept

any and all documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Asset Purchase Agreement. A certified copy of this Confirmation Order may

be: (a) filed with the appropriate clerk; (b) recorded with the recorder; and/or (c) filed or recorded

with any other governmental agency to act to cancel any Claims, Liens and Encumbrances against

the Purchased Assets, other than the Permitted Liens.

15.     <u>Cancellation of Third-Party Claims, Liens and Encumbrances Against the
Purchased Assets</u>. If any person or entity which has filed statements or other documents or

agreements evidencing Claims, Liens and Encumbrances on or in all or any portion of the

Purchased Assets (other than with respect to Permitted Liens, Assumed Contracts, or Assumed

Liabilities) has not delivered to the Debtors prior to the Closing, in proper form for filing and

executed by the appropriate parties, termination statements, instruments of satisfaction, releases of

liens and easements, and any other documents necessary for the purpose of documenting the

release of all Claims, Liens and Encumbrances which such person or entity has or may assert with

respect to all or a portion of the Purchased Assets, the Debtors and Purchaser are authorized to

execute and file such statements, instruments, releases and other documents on behalf of such

person or entity with respect to the Purchased Assets. Notwithstanding the foregoing, the

provisions of this Confirmation Order authorizing the transfer of the Purchased Assets free and

clear of all Claims, Liens and Encumbrances (except only for Permitted Liens, Assumed Contracts,

and Assumed Liabilities) shall be self-executing, and it shall not be, or be deemed, necessary for

any person or entity to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Confirmation Order to be implemented.

16.    <u>Authorization to Assume and Assign</u>. Upon the Closing, the Debtors are authorized and directed, in accordance with Bankruptcy Code sections 105(a), 363, and 365, to assume and assign each of the Assumed Contracts to Purchaser free and clear of all Claims, Liens and Encumbrances (except only for Permitted Liens and Assumed Liabilities) as of the Closing Date in accordance with the Asset Purchase Agreement. The payment or escrow of the applicable Cure Amounts (if any) by Purchaser on account of an Assigned Contract (other than the Ground Lease), and the payment or escrow of the Ground Lease Cure as set forth in the Asset Purchase Agreement, shall (a) effect a cure or adequate assurance of cure of all defaults existing thereunder as of the Petition Date, and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default. Purchaser shall then have assumed the Assumed Contracts without any further pre-assumption duties, financial liabilities or other obligations and, pursuant to Bankruptcy Code section 365(f), the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts by Purchaser and the payment or escrow by the Debtors of the Ground Lease Cure, neither the Plan Sponsors, nor Purchaser, shall have any further liabilities to the counterparties of such Assumed Contracts, other than Permitted Liens and Assumed Liabilities, and Purchaser's obligations under the Assumed Contracts (including the Ground Lease), that accrue and become due and payable on or after the Closing Date.

17.    <u>Assignment Requirements Satisfied</u>. The Assumed Contracts (including the Ground Lease) shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, in accordance with their respective terms, notwithstanding (a) any provision in any such

Assumed Contract (including provisions of the type described in Bankruptcy Code sections 365(b)(2), (e)(1) and (f)(1)) which prohibits, restricts or conditions such assignment or transfer, or (b) any default by the Debtors prior to the Closing Date under any such Assumed Contract or any disputes between the Debtors and a counterparty with respect to any such Assumed Contract arising prior to Closing Date. In particular, any provisions in any Assumed Contract that restrict, prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to Purchaser of the Assumed Contracts have been satisfied. Upon the Closing Date, in accordance with Bankruptcy Code sections 363 and 365 and subject only to Permitted Liens and Assumed Liabilities, Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assumed Contracts (including the Ground Lease).

18.     <u>Consent to Assign</u>. The counterparties to each Assumed Contract (including the Ground Lease) shall be and hereby are deemed to have consented to such assumption and assignment under Bankruptcy Code section 365(c)(1)(B) or this Court has determined that no such consent is required, and Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract as of the Closing Date without the necessity of obtaining the counterparty's written consent to the assumption and assignment thereof.

19.     <u>Section 365(k)</u>. Upon the Closing Date and (a) the payment or escrow of the applicable Cure Amount (if any) or Ground Lease Cure with respect to an Assumed Contract and the Litigation Trust's assumptions of any Liabilities regarding Landlord Litigation, if any, as set

forth in the Asset Purchase Agreement, or (b) in the event of any dispute over the appropriate Cure

Amount, the Debtors' reserve and escrow of the amount necessary to satisfy the Cure Amount

asserted by the counterparty pending resolution of the dispute by this Court, Purchaser shall be

deemed to be substituted for the Debtors as a party to the Assumed Contracts as of the Closing

Date and the Debtors and their estates shall be relieved, pursuant to Bankruptcy Code section

365(k), from any further liability in accordance with the terms of the Asset Purchase Agreement.

20.    <u>No Default</u>. Subject to the terms hereof and in the Asset Purchase Agreement with

respect to the Cure Amounts and Ground Lease Cure including the Cure Escrow, all monetary or

non-monetary defaults or other obligations of the Debtors under the Assumed Contracts arising or

accruing prior to the Closing Date have been cured or shall promptly be cured by the Debtors in

accordance with the Property Condition Cure Ruling, the Property Condition Cure Order, the

Pecuniary Damages Ruling, and the Pecuniary Damages Order, such that Purchaser shall have no

liability or obligation with respect to any default or obligation arising or accruing under any

Assumed Contract prior to the Closing Date, except to the extent expressly provided in the Asset

Purchase Agreement for Permitted Liens and Assumed Liabilities, and except for Purchaser's

payment of the Cure Amounts and Debtors' payment or escrow of the Ground Lease Cure, where

applicable. Each party to an Assumed Contract is forever barred, estopped, and permanently

enjoined from asserting against Purchaser or its property or affiliates, or successors and assigns,

any breach or default under any Assumed Contract, any claim of lack of consent relating to the

assignment thereof, or any counterclaim, defense, setoff, right of recoupment, or any other matter

arising prior to the Closing Date for such Assumed Contract or with regard to the assumption and

assignment therefore pursuant to the Asset Purchase Agreement or this Confirmation Order. Upon

the payment or escrow of the applicable Cure Amount, if any, and the Ground Lease Cure, the

Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

21.    <u>Adequate Assurance Provided</u>. As set forth in the Confirmation and Sale Ruling, the requirements of Bankruptcy Code sections 365(b)(1) and 365(f)(2) are hereby deemed satisfied with respect to the Assumed Contracts (including the Ground Lease) based on Purchaser's evidence of, among other things, its financial condition and wherewithal and without any further action by Purchaser, including but not limited to any other or further deposit; *provided, however*, that solely with respect to the Ground Lease and consistent with the Confirmation and Sale Ruling, if Purchaser makes a capital commitment request of its sponsor consistent with the terms of that certain capital commitment letter dated February 13, 2023 and admitted into evidence at the Confirmation and Sale Hearing as Bay 9 Exhibit 8 (the "**Capital Commitment Letter**"), and such request is denied by the sponsor, Purchaser shall give Landlord prompt written notice of same; *provided, further* that if the Purchaser shall be in default on its rent payments under the Ground Lease during the first three years from the Closing Date, and the Purchaser's sponsor declines a capital commitment request under the Capital Commitment Letter while there remain unused capital funds thereunder, then the sponsor shall guaranty the payment of such unpaid rent up to the amount of any unused capital funds under the Capital Commitment Letter. Subject to the foregoing, and as set forth in the Confirmation and Sale Ruling, pursuant to Bankruptcy Code section 365(f), Purchaser has provided adequate assurance of future performance of the obligations under the Assumed Contracts (including the Ground Lease).

22.    <u>No Fees</u>. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

23.    <u>Injunction</u>. Pursuant to Bankruptcy Code sections 105(a), 363, and 365, other than Permitted Liens, Assumed Liabilities, the right to payment or escrow of the Cure Amounts, if any, the Ground Lease Cure, those obligations set forth at Section 8.2 of the Asset Purchase Agreement with respect thereto and the Landlord Litigation, all counterparties to Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Plan Sponsors or Purchaser any assignment fee, default, breach or claim, or pecuniary loss arising under or related to the Assumed Contracts existing as of the Petition Date or any assignment fee or condition to assignment arising by reason of the Closing Date. For the avoidance of doubt, the parties' rights and remedies with respect to the Reserved Unknown Insurance Claims set forth in paragraph S.12 are fully reserved hereunder. This paragraph 23 shall not affect the parties' rights and remedies in the Landlord Litigation.

24.    <u>Contract Objections</u>. Except as set forth herein, each counterparty to an Assumed Contract is deemed to have consented to such Cure Amount, if any, and the Ground Lease Cure. Except as set forth herein, each counterparty to an Assumed Contract is deemed to have consented to the assumption and assignment, and Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to, such Assumed Contracts pursuant to Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B). Nothing in this Confirmation Order or in any notice or any other document is, or shall be, deemed an admission by the Debtors that any Assumed Contract is an executory contract or unexpired lease, or must be assumed and assigned pursuant to the Asset Purchase Agreement in order to consummate the Sale Transaction.

25.    <u>No Further Debtor Liability</u>. Except as provided in the Asset Purchase Agreement or in this Confirmation Order, including the Ground Lease Cure, after the Closing Date, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, its successors or assigns, its property, or the Debtors' estates.

26.    <u>No Waiver of Rights</u>. The failure of the Debtors or Purchaser to enforce, at any time, one or more terms or conditions of any Assumed Contracts shall not be a waiver of any such terms or conditions, or of the Debtors' or Purchaser's rights to enforce every term and condition of the Assumed Contracts.

27.    <u>No Successor Liability</u>. Except for the Permitted Liens, Assumed Contracts, and Assumed Liabilities set forth in the Asset Purchase Agreement, or as otherwise expressly provided for in this Confirmation Order, Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Assets for any reason or under any theory, including without limitation, alter ego, de facto merger, piercing the corporate veil or any other form of successor liability. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Asset Purchase Agreement, Purchaser shall not be liable for any Claims against the Debtors or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and its

affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in

connection with, or in any way relating to the operation of any of the Assets prior to the Closing

Date.

      28.    <u>Limitation of Purchaser Liability</u>. Other than as expressly set forth in the Asset

Purchase Agreement or this Confirmation Order, the Purchaser shall not have any responsibility

for (a) any liability or other obligation of the Debtors or related to the Assets or any claims against

the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Asset

Purchase Agreement, the Purchaser shall not have any liability whatsoever with respect to the

Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the

Debtors' (or their predecessors' or affiliates') obligations  based, in whole or in part, directly or

indirectly, on any theory of successor or vicarious liability of any kind of character, or based upon

any theory of antitrust, environmental, successor, or transferee liability, de facto merger or

substantial continuity, labor and employment or products liability, whether known or unknown as

of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent,

liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes

arising, accruing, or payable under, out of, in connection with, or in any way relating to the Assets

or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan,

agreement, practice, policy, or program, whether written or unwritten, providing for pension,

retirement, health, welfare, compensation, or other employee benefits which is or has been

sponsored, maintained, or contributed to by any Debtor or with respect to which any Debtor has

any liability, whether or not contingent, including, without limitation, any "multiemployer plan"

(as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA)

to which any Debtor has at any time contributed, or had any obligation to contribute. Except to the

extent expressly included in the Assumed Liabilities with respect to the Purchaser or as otherwise expressly set forth in the Asset Purchase Agreement, no Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act, 29 U.S.C. §§ 2101 et seq., (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Assets, assumption of the Assumed Liabilities. Without limiting the foregoing, no Purchaser Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Purchased Assets except to the extent they are Assumed Liabilities set forth in the Asset Purchase Agreement.

29.    <u>Actions Against Purchaser Enjoined</u>. Except with respect to Permitted Liens, Assumed Contracts, and Assumed Liabilities set forth in the Asset Purchase Agreement, or as otherwise permitted by the Asset Purchase Agreement or this Confirmation Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding any Claims, Liens or Encumbrances of any kind or nature whatsoever against, or in, all or any portion of the Purchased Assets, arising under, out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Purchased Assets to Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, or any of its affiliates, successors, or assigns, or their property or the Purchased Assets, such persons' or

entities' Claims, Liens and Encumbrances in and to the Purchased Assets, including, without limitation, the following actions against Purchaser or its affiliates, or their successors, assets, or properties: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any Claims, Liens and Encumbrances; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Confirmation Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the business operated with the Purchased Assets.

30.     <u>Asset Purchase Agreement Approved in Entirety</u>. The failure specifically to include any particular provision of the Asset Purchase Agreement in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized as approved in its entirety herein.

31.     <u>Automatic Stay</u>. The automatic stay pursuant to Bankruptcy Code section 362 is hereby modified, lifted, and annulled with respect to the Debtors and Purchaser to the extent necessary, without further order of this Court, to (a) allow Purchaser to deliver any notice provided for in the Asset Purchase Agreement, and (b) allow Purchaser to take any and all actions permitted under the Asset Purchase Agreement in accordance with the terms and conditions thereof.

32.     <u>Distribution of Net Sale Proceeds</u>.  Upon the Closing of the Sale Transaction, all Net Sale Proceeds therefrom after payments required under the Plan to pay or escrow any unpaid Ground Lease Cure, Allowed Administrative Claims, Priority Tax Claims, Professional Claims,

DIP Facility Claims, the Dallas County Claim, Diminution Claim and the U.S. Trustee Fees, shall be paid to the Trustee for Distribution to holders of Original Bonds, pursuant to the terms of the Original Bond Documents.

33.    <u>Deemed Consent</u>. To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the members, managers, or directors of the Debtors, this Confirmation Order shall, pursuant to Bankruptcy Code section 1142, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the directors, managers, and member of the Debtors.

34.    <u>Objections</u>. For the reasons stated on the record in the Confirmation and Sale Ruling, objections to Confirmation of the Plan by the United States Trustee, the Landlord and David Stephen Donosky are overruled on the merits, and the objection to Confirmation by the Committee was resolved by agreement of the parties as set forth herein.

35.    <u>Settlement of Claims and Controversies</u>. Pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019, and in consideration for the considerable funding and benefits provided in the Plan, the provisions of the Plan shall constitute good faith compromise of all Claims, Interests, and controversies relating to the rights that a Holder of a Claim or Interest may have with respect to such Claim or Interest or any Distribution on account thereof. For the avoidance of doubt, the Settlement is appropriately described and incorporated into the Plan in all respects. The entry of this Confirmation Order shall constitute approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. After the Effective Date, the Litigation Trustee, or Residents Trust Trustee, as applicable, may, and shall have the right to, compromise

and settle any Claims against the Debtor, Litigation Trust, or Residents Trust, as the case may be, and Causes of Action against any other Person or Entity subject to the provisions of the Plan.

36.    <u>Payments to U.S. Trustee</u>. To the extent required by applicable law, the Litigation Trustee or the Debtors will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

37.    <u>Approval of Plan Releases, Exculpations, and Injunctions.</u> Each release, exculpation, and injunction provision set forth in the Plan is hereby approved; *provided, however*, that nothing contained in the Plan or this Confirmation Order shall be deemed to impact, modify or otherwise amend or alter the terms of the Settlement. The exculpation provided in Section 8 of the Plan is approved only as to the Debtors, the Committee, and the individual members of the Committee in their capacity as such. Notwithstanding the foregoing, no claim or cause of action against any of the Exculpated Parties may be brought by any Person for any claim or cause of action in connection with or related to these Chapter 11 Cases, the administration of the Plan or Assets to be distributed under the Plan, the  winding down of the Estates, the Sale Transaction or the transactions in furtherance of the foregoing without first seeking and being granted leave from the Bankruptcy Court prior to commencing such asserted claim or cause of action. For the avoidance of doubt, none of the foregoing shall be applicable to any party who has "opted out" of the release at Section 8.2 of the Plan; provided further, however, that nothing in this pararaph 37 shall interfere with the parties' existing rights in the Landlord Litigation.

38.    <u>Rejection of Executory Contracts</u>. In accordance with Bankruptcy Code section 1123(b)(2), upon entry of the Confirmation Order, Debtors will be conclusively deemed to have

rejected all Executory Contracts and Unexpired Leases including the Commission Agreement with David Stephen Donosky for the reasons set forth in the Confirmation and Sale Ruling which overruled the *Objection of David Stephen Donosky to Third Amended Plan of Reorganization* [Docket No. 1200], to the extent (a) they are not expressly identified as Assumed Contracts under the Asset Purchase Agreement on the Closing Date, or (b) not expressly assumed by the Debtors prior to the Effective Date or listed in the Plan Supplement, pursuant to Section 5 of the Plan or another order of the Court. This Confirmation Order shall constitute an order of the Court under Bankruptcy Code sections 365 and 1123(b) approving the rejections as of the Effective Date.

Rejection Damage Claim and Related Claim Bar Date. A proof of claim arising from the rejection of an executory contract or unexpired lease (such claim, a "**Rejection Damage Claim**") must be filed with the Court and served upon counsel for Debtors on or before the Rejection Damage Claim Bar Date; provided however that, with respect to the rejection of Residency Agreements, the holders of Refund Claims are not required to file Rejection Damage Claims if such Resident Claimants agree with the proposed amount of the respective Resident Claimant's Refund Claim, as set forth in the Resident Claim Cover Letter accompanying the Resident Claimant's Ballot. If any Resident Claimants disagree with the amount of their respective Refund Claim, as set forth in the Resident Claim Cover Letter accompanying each Resident Claimant's respective Ballot, then the Resident Claimants shall be required to file a Rejection Damage Claim on or before the Rejection Damages Bar Date. Any and all Rejection Damage Claims not filed on or before the Rejection Damage Claim Bar Date shall be automatically disallowed and forever barred in its or their, as applicable, entirety and shall not be enforceable against the Litigation Trust, the Residents Trust, the Debtors, the Debtors' estates, or their respective properties or interests in property as agents, successors, or assigns.

39.   <u>Allowed Secured Claim of Dallas County</u>. On the Effective Date, the Litigation Trustee shall pay $26,856.19 plus accrued interest to Dallas County in full satisfaction of its Allowed Secured Claim on account of taxes assessed in 2022.

40.   <u>Reservation of Rights of Governmental Unit</u>. Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") that is not a "claim" as defined in 11 U.S.C. § 101(5); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date: (iii) any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors. Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Notwithstanding any provision of the Plan, this Confirmation Order, or any implementing or supplementing plan documents, nothing herein shall affect the rights of the Texas Health and Human Services Commission from exercising its rights of recoupment. Nothing in this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or the Plan or to adjudicate any defense asserted under this Confirmation Order or the Plan. Further, Governmental Units are deemed to have opted out of the releases in the Plan without the need to file an opt-out form.

41.   <u>Plan Modifications</u>.  The first sentence of Section 2.2 of the Plan shall be replaced with the following: "All Professionals seeking payment of Professional Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is forty five (45) days

after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy

Court within five (5) Business Days after the date that such Claim is Allowed by order of the

Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the

holder of such an Allowed Professional Claim and the Plan Sponsors; provided however that

Professional Claims, other than Claims of KCC, shall be cumulatively capped at $2 million from

the period of December 1, 2022 through March 31, 2023, with holders of Professional Claims,

other than Claims of KCC, sharing Pro Rata in the $2 million in the event such Professional Claims

exceed the cap during the period of December 1, 2022 through March 31, 2023."

42.     Section 4.14 of the Plan shall be removed in its entirety and shall be replaced with

"[Reserved]."

43.     Footnotes three (3) and seven (7) of the Plan shall be removed in their entirety.

44.     Section 8.5 of the Plan shall be removed in its entirety.

45.     <u>Debtors' Authorization</u>. Debtors are hereby authorized and fully empowered to take

any and all actions as may be necessary and appropriate to consummate, effectuate, and implement

the Plan and all transactions contemplated thereby, including, without limitation, to effectuate or

otherwise document the transfer of assets, pursuant to the terms, and subject to the conditions, of

the Plan.

46.     <u>Rights of Holders of Allowed Claims</u>. All rights of Holders of Allowed Claims,

including, without limitation, the right to receive a Distribution on account of such Claim(s), shall

hereinafter be limited solely to the right to receive such Distribution only to the extent and as

expressly provided in this Confirmation Order and under the Plan.

47.     <u>Notice of Entry of this Confirmation Order</u>. Within five (5) business days of the

entry of this Confirmation Order, the Plan Sponsors shall transmit a notice of this Confirmation

Order (the "**Notice of Confirmation Order**") via first class mail with postage prepaid to all of its known creditors and parties-in-interest. Such notice shall be adequate under the circumstances and shall be sufficient to meet the requirements necessary for due process and Bankruptcy Rule 2002(f)(7). The Notice of Confirmation Order shall further set forth the Rejection Damage Claim Bar Date, Administrative Claim Bar Date, and Professional Fee Claim Bar Date, each as set forth and defined herein.

48.     <u>Notice of Effective Date and Related Deadlines</u>. Within five (5) business days after the Effective Date, the Plan Sponsors shall file a notice of occurrence of the Effective Date (the "**Notice of Effective Date**") with the Court and serve it upon all known creditors and parties required to receive notice pursuant to Bankruptcy Rule 2002.

49.     <u>Administrative Claim Bar Date</u>. All parties shall file any and all requests for allowance and payment of administrative expenses incurred on or before the day immediately preceding the Effective Date pursuant to Bankruptcy Code sections 503(b), 507(a)(2), or 507(b), including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date, of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5) (collectively, "**Administrative Claims**") no later than thirty (30) days after the Effective Date (the "**Administrative Claims Bar Date**"), as defined in Section 1.8 of the Plan. Administrative Claims filed after the Administrative Claims Bar Date shall be disallowed and forever barred in their entirety.

50.     <u>Professional Claim Bar Date</u>. All parties shall file final applications for allowance and payment of fees, costs, and expenses incurred by any estate professionals through and

including the day immediately preceding the Effective Date pursuant to Bankruptcy Code sections

330, 331, 503, or 1103 (collectively, "**Professional Fee Claims**") on the first business day that is

forty-five (45) calendar days after the Effective Date (the "**Professional Fee Claims Bar Date**").

Professional Fee Claims filed after the Professional Fee Claims Bar Date shall be disallowed and

forever barred.

51.     <u>Professional Fee Claims</u>. Professional Fee Claims must be filed with the Court and

served on the following parties by e-mail correspondence to:

a.     Counsel to the Debtors c/o Jeremy R. Johnson, jeremy.johnson@polsinelli.com and Trinitee G. Green, tggreen@polsinelli.com;

b.     Counsel to UMB Bank N.A. c/o Daniel Bleck, dsbleck@mintz.com, Eric Blythe, erblythe@mintz.com, and Kaitlin Walsh, krwalsh@mintz.com;

c.     Counsel to the Committee c/o Stephen A. McCartin, smccartin@foley.com and Thomas C. Scannell, tscannell@foley.com; and

d.     The Office of the United States Trustee, c/o lisa.l.lambert@usdoj.gov.

52.     The Court shall determine the Allowed amounts of filed Professional Fee Claims

after notice and a hearing in accordance with the procedures established by the *Order Establishing*

*Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket

No. 401] and the Bankruptcy Code. The Litigation Trustee or Debtor, as applicable, shall pay

Professional Fee Claims in Cash in the Allowed amount in accordance with the Court's order with

respect thereto.

53.     <u>Binding Effect</u>. Unless otherwise provided in the Plan or this Confirmation Order,

on the date of and after entry of this Confirmation Order and subject to the occurrence of the

Effective Date, the provisions of the Plan and this Confirmation Order shall bind: (a) Lifespace;

(b) the Plan Sponsors; (c) the Committee; (d) the Residents Trust; (e) the Litigation Trust; (f) the

Residents Trust Trustee; (g) the Litigation Trustee; (h) all holders of Claims against and any

Interests in the Debtors, including their successors and assigns, whether or not the Claims or

Interests are impaired under the Plan, whether or not the Holders thereof voted to accept the Plan

or filed proofs of Claim in the Chapter 11 Cases; (i) any entity acquiring property under the Plan

or this Confirmation Order; (j) any and all non-Debtor parties to Executory Contracts and

Unexpired Leases, including the Ground Lease; and (k) any and all entities that are parties to or

subject to the releases, discharges, exculpations, and injunctions described in the Plan.

54.    <u>Vesting of Assets</u>. Except as otherwise provided in the Plan, this Confirmation

Order, the Asset Purchase Agreement, or any agreement, instrument, or other document

incorporated herein or therein, including any and all documents included in the Plan Supplement,

on the Effective Date, any assets of the Debtors remaining after consummating the Sale

Transaction shall vest in the Litigation Trust, with the exception of the Cure Escrow, which shall

remain property of the Estates, and the Residents Trust Assets, which shall vest in the Residents

Trust, in each case free and clear of Liens, Claims, charges or other encumbrances.

55.    <u>Access to Books and Records</u>. Following the Closing Date and pursuant to the

terms in the Asset Purchase Agreement, the Purchaser and Debtors shall have reasonable access

to the Debtors' books and records.

56.    <u>Post-Confirmation Modifications</u>. Subject to the limitations set forth in the Plan,

after entry of this Confirmation Order but prior to the substantial consummation of the Plan the

Plan Sponsors may alter, amend, or modify the Plan in accordance with Bankruptcy Code section

1127(b); *provided, however*, that the Plan Sponsors shall file any such altered, amended or

modified version of the Plan on the docket of the Chapter 11 Cases concurrently with the Notice

of Effective Date. The Debtors are authorized to make appropriate technical adjustments, remedy

any defect or omission, or reconcile any inconsistencies in the Plan, the Plan Supplement, and this

Confirmation Order. Notwithstanding the foregoing, the Debtors and the Purchaser shall not

materially amend or otherwise materially modify the Asset Purchase Agreement without further

order of this Court after notice and an opportunity to be heard.

57.     Dissolution of Committee. On the Effective Date, the Committee shall dissolve

automatically and all members thereof (solely in their capacities as such) shall be released and

discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11

Cases.

58.     Discharge and Termination of Patient Care Ombudsman. On the Effective Date, the

PCO appointed in the Chapter 11 Cases shall be discharged and relieved from her duties and

responsibilities as Patient Care Ombudsman in the Chapter 11 Cases. The PCO and the PCO's

Professionals, if any, are authorized to dispose of or destroy any documents provided by the

Debtors or any third parties to the PCO, if any, in the course of their evaluation, in accordance

with their respective document retention policies or applicable law.

59.     Amendments/Headings. This Confirmation Order may be amended or

supplemented only upon further, Final Order of the Court. The headings used herein are for ease

of reference only and shall not be used in interpreting this Confirmation Order.

60.     References to Plan Provisions. The failure specifically to include or reference any

particular article, section or provision of the Plan (and the Plan Supplement) or any related

document in this Confirmation Order shall not diminish or impair the effectiveness of such article,

section or provision, it being the intent of this Court that the Plan (and the exhibits and schedules

thereto), inclusive of any express modifications set forth in this Confirmation Order, be confirmed

in its entirety and any related documents be approved in their entirety and incorporated herein by reference.

61.     <u>No Admission or Waiver</u>. None of the filing of the Plan, any statement or provision contained within the Plan or the taking of any action by any Debtor with respect to the Plan (and Plan Supplement), the Disclosure Statement or Confirmation Order shall be deemed to be an admission or wavier of any rights of any Debtor.

62.     <u>Retention of Jurisdiction</u>. Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court shall retain jurisdiction over all matters arising in, arising under, or related to these Chapter 11 Cases to the fullest extent legally permissible and as expressly set forth in Section 11 of the Plan.

63.     <u>Successors/Assigns</u>. The Plan and this Confirmation Order shall be binding upon, and inure to the benefit of, the Debtors' successors, designees, assigns, beneficiaries, executors, administrators, and personal representatives.

64.     <u>Conflicts Between this Confirmation Order and the Plan</u>. The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however*, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then solely to the extent of such inconsistency the provisions of this Confirmation Order shall govern. The provisions of this Confirmation Order are integrated with each other and are non-severable and mutually dependent unless expressly stated by further order of this Court. For the avoidance of doubt, if there are any inconsistencies between (a) the Rule 9019 Order and Settlement, on one hand; and (b) the Plan, on the other hand, then the terms of the Rule 9019 Order

and Settlement shall control and shall be considered integrated into this Confirmation Order as though set forth herein.

65. <u>Waiver of Stay</u>. The requirements under Bankruptcy Rule 3020(e) that an order confirming a Plan is stayed until the expiration of fourteen (14) days after entry of the order is hereby waived. This Confirmation Order is a Final Order and shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062. The Debtors are authorized to consummate the Plan on any business day after entry of this Confirmation Order, subject to satisfaction or waiver (by the required parties) of the conditions set forth in Section 9.2 of the Plan.

66. <u>Finality and Immediate Effect of Confirmation Order</u>. This Confirmation Order (a) is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof; and (b) notwithstanding the applicability Bankruptcy Rule 3020(e), shall be immediately effective and enforceable upon the entry hereof. The failure to reference or address all or part of any particular provision of the Plan herein has no effect on the validity, binding effect, or enforceability of such provision and such provision has the same validity, binding effect, and enforceability as every other provision of the Plan.

67. <u>Substantial Consummation</u>. Substantial consummation of the Plan under Bankruptcy Code sections 1101 and 1127 shall be deemed to occur on the Effective Date.

68. <u>Transfers to the Residents Trust</u>. The Debtors are hereby authorized and directed to transfer information deemed reasonably necessary by the Trustee of the Residents Trust to fulfill his or her duties and obligations under the Residents Trust Agreement including, but not limited to, Residents names, addresses, current level of care being provided, entrance fee deposit amounts as of the Effective Date, copies of existing residency agreements, amounts of life care benefits as

of the Effective Date, if any, being provided to each Current Resident under their existing Life

Care Agreements with the Debtors, and other information deemed reasonably necessary by the

Trustee to  fulfill his or her duties and obligations under the Residents Trust Agreement. The

Trustee and its agents, professionals and advisors shall keep all non-public information relating to

each individual Resident confidential pursuant to the provisions of Section 9.10 of the Residents

Trust Agreement and shall use such non-public information solely for carrying out its duties under

the Resident Trust Agreement.

69.     For the avoidance of doubt, the Plan Implementation Orders are incorporated herein

as is set forth herein.

### ### End of Order ###

Submitted by:

Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tggreen@polsinelli.com

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

*Counsel to Debtors and*
*Debtors in Possession*

and

J. Frasher Murphy (SBN 24013214)
Thomas J. Zavala (SBN 24116265)
Haynes and Boone, LLP

2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
frasher.murphy@haynesboone.com  tom.zavala@haynesboone.com

Daniel S. Bleck (Admitted *Pro Hac Vice*)
Eric Blythe (Admitted *Pro Hac Vice*)
Kaitlin R. Walsh (Admitted *Pro Hac Vice*)
Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, PC
One Financial Center
Boston, MA 02111
Telephone: (617) 546-6000
dsbleck@mintz.com
erblythe@mintz.com
krwalsh@mintz.com

*Counsel to UMB Bank, N.A. as Trustee and DIP Lender*

502868022v.10

# EXHIBIT 1

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934353

**EXECUTION
VERSION**

# FIRST AMENDED AND RESTATED
## SETTLEMENT AND CONTRIBUTION AGREEMENT

This FIRST AMENDED AND RESTATED SETTLEMENT AND CONTRIBUTION AGREEMENT ("Agreement") is executed by and entered into between Northwest Senior Housing Corporation d/b/a Edgemere ("Edgemere" and Lifespace Communities, Inc. ("Lifespace") (each individually a "Party", and collectively the "Parties") effective as of February __, 2023.

## RECITALS[1]

A.    **Overview of Edgemere's Business.**

1.    Edgemere is an upscale and well-established continuing care retirement community ("CCRC") that offers senior residents a continuum of care in a luxury campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older. Edgemere consists of approximately 304 independent living ("IL") apartment-style residences in one, two and three-bedroom configurations. Edgemere also houses 68 residential-style assisted living ("AL") suites, 45 memory support ("MS") assisted living suites and a skilled nursing Community ("SNF") with 87 skilled nursing beds, all located on a 16.25 acre campus.

2.    As of October 19, 2022, 219 IL units were occupied (72.04% occupancy), 39 AL units were occupied (57.35% occupancy), 21 MS units occupied (46.67% occupancy), and 54 SNF units were occupied (62.07% occupancy). The Community is currently the home of approximately 376 residents.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

3.     As is common practice in the CCRC industry, Edgemere primarily receives revenue from entrance fees and monthly service fees. Historically, the residents have been required to enter into one of the following types of Residency Agreements to move into the Community: Life Care Agreements, Assisted Living Residency Agreements, and SNF Residency Agreements.

**B.     Current, Former and Escrow Residents**

1.     There are three (3) categories of Edgemere residents:

a.     Former residents of Edgemere ("Former Residents");

b.     Current residents of Edgemere, excluding the Escrow Residents ("Current Residents"); and

c.     Residents that currently reside at Edgemere under the terms and conditions of an Escrow Agreement dated September 27, 2021, by and among Edgemere, the Trustee, and Regions Bank as escrow agent (the "Escrow Residents" and, together with the Current and Former Residents, the "Residents").

**C.     Lifespace Affiliation Agreement**

1.     In June 2019, Lifespace entered into an Affiliation Agreement pursuant to which Lifespace became the new sole member of Edgemere.

2.     Edgemere relies on revenue generated by existing and new residents to, among other things, maintain day-to-day operations, service debt obligations and honor Resident obligations. However, for some time Edgemere has faced challenges that have threatened its ability to honor its obligations and maintain operational stability, including optimal occupancy levels.

SETTLEMENT AGREEMENT                                         Page 2 of 18
4875-8801-8504.6

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

**D.**     **The Chapter 11 Cases**

1.     On April 14, 2022 (the "Petition Date"), Edgemere  filed a voluntary petition in this Court jointly with affiliate Senior Quality Lifestyles Corporation (together with Edgemere, the "Debtors") commencing a case for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Lead Case No. 22-30659] (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Nick Harshfield in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 7] ("First Day Declaration") and fully incorporated herein by reference.

2.     The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.     On April 28, 2022, the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") pursuant to Bankruptcy Code section 1102(a)(1).

**E.**     **Joint Chapter 11 Plan**

1.     On February 17, 2023, the Trustee and the DIP Lender filed their *Fourth Amended Joint Plan of Reorganization* [Docket No. 1241] (as amended, the "Plan"), which is supported by Lifespace and the Committee. The Plan incorporates the terms of this Agreement.

**F.**     **Resident Refund Obligations**

1.     The Plan proposes to reject all Residency Agreements with Current, Former, and Escrow Residents, and provides for the purchaser of Edgemere's assets pursuant to the Sale Procedures Motion to offer the Current Residents new residency agreements. Accordingly, the

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

Residents will have rejection damages claims against Edgemere, including claims for the refund of their entrance fees due and owing under the rejected Residency Agreements, in the following approximate amounts:

a.  Escrow Residents: $16,494,326 is currently held in escrow for the benefit of Escrow Residents (the "Entrance Fee Escrow Deposits"). The Plan provides for Entrance Fee Escrow Deposits to be returned to the Escrow Residents in full and final satisfaction of their claims within ten (10) days of the Effective Date of the Plan.

b.  Former Residents: Former Residents shall have allowed entrance fee refund obligation claims against Edgemere of approximately $38,339,305.00 (individually, an "Allowed Former Resident Claim" and in the aggregate, "Allowed Former Resident Claims").

c.  Current Residents: Current Residents shall have allowed entrance fee refund obligation claims against Edgemere of approximately $105,168,213.00 (individually, an "Allowed Current Resident Claim" and in the aggregate, "Allowed Current Resident Claims" and together with the Allowed Former Resident Claims, the "Allowed Refund Claims").

**G.    Settlement**

1.     Pursuant to the terms of the Plan and this Agreement, Lifespace has agreed to fund contributions to the Residents Trust (hereinafter defined) pursuant to the Plan as a settlement of any potential claims the Debtors, the Trustee and/or the Residents (who do not OPT OUT under the terms of the Plan) may have against Lifespace pursuant to the Residency

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

Agreements, the Affiliation Agreement, under the Bankruptcy Code, at law or in equity and in exchange for full releases and exculpations provided under the Plan (the "Plan Releases").

2.      The Committee actively participated in the negotiation of this Agreement with Lifespace, supports and endorses its approval, and has encouraged Edgemere to likewise support and endorse this Agreement.

3.      After considering the Committee's recommendation, Edgemere has evaluated this Agreement and has concluded it represents the best outcome presented to Edgemere for the Residents.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing recitals, reliance upon the Committee's negotiations and support, and the promises and mutual covenants contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree and stipulate, contingent upon Bankruptcy Court confirmation of the Plan, to the terms set forth below:

1.      The Residents Trust. On the Effective Date of the Plan, a trust (the "Residents Trust") shall be formed for the benefit of Former Residents and Current Residents who do not OPT OUT of the settlement and the releases in the Plan (the "Participating Former Residents" and "Participating Current Residents," respectively) pursuant to the terms of the Plan and a Residents Trust Agreement in form and substance satisfactory to Lifespace and the Committee.

(a)      Lifespace Contributions to the Residents Trust. Lifespace hereby agrees to contribute to the Residents Trust an amount equal to the sum of (i) the total Allowed Refund Claims of Participating Former Residents, (ii) the total Allowed Refund Claims of Participating Current Residents, and (iii) the total projected Residents Trust expenses

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

(the "Lifespace Trust Contribution"), in annual payments in the amounts listed on the Contribution Schedule attached hereto as **Exhibit 1.**[2]   The annual Lifespace Trust Contributions listed on Exhibit 1 shall be made on December 31 of each year for the subsequent calendar year (the "Payment Date").   By way of example, the Lifespace Trust Contribution for 2024 shall be made on December 31, 2023.

2.      Beginning in year 2025:

(a)      If any portion of any required annual payment of the Lifespace Trust Contribution would result in Lifespace failing to maintain at least 250 days of cash and cash equivalents on hand (the "Lifespace Minimum DCOH") then such portion of the annual payment may be deferred to the following year (the "Lifespace Deferral");

(b)      Any Lifespace Deferral that has accrued for two years is due to be paid in full the following year unless it may be deferred under the following paragraph.

(c)      If any portion of any Lifespace Trust Contribution would trigger an event of default (an "MTI Default") under the Lifespace Master Trust Indenture dated November 1, 2010, (as amended, and as may be further amended, the "Master Trust Indenture"), then any such portion may be deferred until such deferred portion would not trigger an MTI Default.

(d)      Commencing on December 15, 2024 and on December 15 of each year thereafter, Lifespace shall prepare and deliver to the Trustee a statement setting forth its good faith estimate of the Lifespace Minimum DCOH projection as of the Payment Date for the following year to determine if any portion of the required Lifespace Trust

---

[2] Exhibit 1 currently assumes that all Residents will participate in the settlement and releases in the Plan.  If any Resident elects to OPT OUT of the settlement and releases in the Plan, such Resident will not participate in any distributions under this Agreement or the Residents Trust, and the Lifespace Trust Contribution set forth on Exhibit 1 will be reduced by an amount equal to such Resident's Allowed Resident Claim.

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

Contribution for that year will cause the Lifespace days of cash and cash equivalents on hand ("DCOH") to go below the Lifespace Minimum DCOH or cause an MTI Default as of the Payment Date (the "Financial Threshold Estimate"). The Financial Threshold Estimate shall contain a certificate of the Chief Financial Officer of Lifespace certifying that the Financial Threshold Estimate was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such Financial Threshold Estimate was being prepared and audited as of a fiscal year end.

3.    Post-Payment Date Adjustment.

(a)    Within 150 days after the Payment Date, Lifespace shall deliver to the Trustee a statement certified by the Lifespace auditor setting forth the final calculation of the Lifespace DCOH as of the Payment Date (the "Final DCOH Calculations") and final determination of whether an MTI Default would have in fact occurred from the payment due on the Payment Date (the "MTI Default Calculation" and together with the Final DCOH Calculation the "Final Audited Certification").

(b)    Lifespace shall pay any underpayment, and the Trustee shall return any overpayment, within 30 days of delivery of the Final Audited Certification.

4.    Examination and Review.

(a)    After receipt of the Final Audited Certification, the Trustee shall have 30 days (the "Review Period") to review the Final Audited Certification. During the Review Period, the Trustee shall have reasonable access to Lifespace information relating to the

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934353

Final Audited Certification.  The Trustee may object to the Final Audited Certification by delivering to Lifespace before the expiration of the Review Period a written objection setting forth in reasonable detail the basis for the Trustee's objection (the "Objection"). If the Trustee does not deliver an Objection before the expiration of the Review Period, the Trustee shall be deemed to have accepted and agreed to the Final Audited Certification.

(b)     If the Trustee delivers an Objection before the expiration of the Review Period, Lifespace and the Trustee shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Objection, which Resolution Period may be extended upon the written mutual agreement of Lifespace and the Trustee (the "Resolution Period").  If any part of the Objection is not resolved by the expiration of the Resolution Period, the unresolved portion of the Objection shall be submitted to KPMG (the "Independent Accountant") for resolution.   The decision of the Independent Accountant (the "Independent Accountant Decision") shall be final and binding on the Parties.  Any payments required to be made under this Agreement shall be consistent with the Independent Accountant Decision and shall be made within 30 days after the Independent Accountant Decision.  The costs of the Independent Accountant shall be paid by the losing Party.

5.     <u>Distributions of Trust Assets.</u> The Residents Trust shall receive the Lifespace Trust Contributions and distribute the trust funds as set forth below:

(a)     <u>Participating Former Residents</u> shall receive a distribution in the amount of their Allowed Former Resident Claims within sixty (60) days of:

(i)     the earlier of the date (a) the Residents Trust has been informed that the Participating Former Resident's independent living unit

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D9759E594933

has been re-leased[3] by a new resident, and (b) October 31, 2025; and

    (ii)    the Residents Trust has sufficient funds, after reasonable reserves, to make such distribution (the Trustee shall reserve sufficient funds in the Residents Trust as he or she deems necessary for the payment of Residents Trust expenses and future Life Care Subsidy (defined below) payments to Participating Current Residents (the "Reserve").

(b)    <u>Participating Current Residents</u> shall receive a distribution in the amount of their Allowed Refund Claims within sixty (60) days of:

    (i)    vacating the Edgemere facility, either through death or by moving out of the facility;

    (ii)    the earlier of the date (a) the Residents Trust has been informed that the Participating Current Resident's independent living unit has been re-leased[3] by a new resident, and (b) three (3) years from the date the Resident vacated the Community; and

    (iii)    the Residents Trust has sufficient funds, after a Reserve, to make such distribution.

(c)    <u>Potential Queue.</u> If there are insufficient funds in the Residents Trust to fully pay an Allowed Refund Claim, such Resident shall receive whatever portion of the Allowed Resident Claim is available at that time (subject to an adequate Reserve), with the remaining portion of the Allowed Resident Claim payable in subsequent years as funds become available. If there is more than one Resident who is not fully paid their Allowed Resident Claim when due under this Agreement, the Residents Trust shall pay those Participating Residents in the chronological order of the Refund Trigger Date (defined in the Plan) as funds become available to the Residents Trust.

---

[3] The Residents Trust shall be informed of units which have been re-leased semi-annually by the Purchaser, which shall be the date the Residents Trust is deemed informed of units which have been re-leased for purposes of the Refund Trigger Date. In addition, the parties anticipate that unique factual scenarios may arise from time to time which will require the Trustee to use his or her discretion to determine if the vacated unit has been re-leased within the spirit of this Agreement.

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E7-4A311BC0CC0A

6.    Life Care Subsidy

(a)    Participating Current Residents that reside in a higher level of care as of the Effective Date of the Plan, and who are receiving life care benefits under their existing Residency Agreements from Edgemere prior to the Effective Date of the Plan, may request, and the Residents Trust shall pay directly to such Participating Current Resident (subject to the availability of funds in the Residents Trust and an adequate Reserve), a monthly amount equal to the life care benefit being received from Edgemere prior to the Effective Date of the Plan. Subsequent increases after the Effective Date of the Plan in the monthly fee charged to such Resident for the higher level of care will not be advanced by the Residents Trust unless such Resident qualifies under Sections 6(b) or 6(c) below. All payments made directly to any Participating Current Resident hereunder shall be deducted from such Participating Current Resident's Allowed Refund Claim until the Allowed Refund Claim is exhausted, at which time all payments from the Residents Trust to the Resident shall cease.

(b)    Participating Current Residents who advance from independent living to a higher level of care within the community on or after the Effective Date of the Plan may request, and the Residents Trust shall pay directly to such Participating Current Resident (subject to the availability of funds in the Residents Trust, and an adequate Reserve), the portion of such Resident's monthly fee for the elevated level of care that exceeds the then-current monthly fee charged to such Resident for his or her independent living services, measured as of the date such Resident advances to that higher level of care (subsequent increases in the monthly fee of the higher level of care will not be advanced by the Trust unless such Resident qualifies under Sections 6(c) or 6(d) below). All

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-CA1B5E530C3A

payments made directly to any Participating Current Resident hereunder shall be deducted from such Participating Current Resident's Allowed Refund Claim until the Resident's Allowed Refund Claim is exhausted, at which time all payments from the Residents Trust to the Resident shall cease.

(c)    Participating Current Residents receiving benefits pursuant to paragraph 6(a) or 6(b) hereof and who subsequently advance to an even higher level of care in the community (for example, a Participating Current Resident who advances from independent living to assisted living pursuant to the terms outlined in paragraph 6(b), and then later advances from assisted living to skilled nursing) may request, and the Residents Trust shall pay directly to such Participating Current Resident (subject to the availability of funds in the Residents Trust, and an adequate Reserve), the portion of such Resident's monthly fee for the elevated level of care that exceeds the then-current monthly fee charged to such Resident, measured as of the date such Resident advances to that higher level of care (subsequent increases in the monthly fee of the higher level of care will not be advanced by the Residents Trust unless such Resident qualifies under Section 6(d) below). All payments made directly to any Participating Current Resident hereunder shall be deducted from such Participating Current Resident's Allowed Refund Claim until the Resident's Allowed Refund Claim is exhausted, at which time all payments from the Residents Trust to the Resident shall cease.

(d)    In addition, Participating Current Residents that are able to establish to the satisfaction of the Residents Trust Trustee that he or she is indigent and unable to pay all or any portion of their monthly fee may request, and the Residents Trust shall pay directly to such Participating Current Resident (subject to an adequate Reserve), such portion of

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D6738E93493J

the Participating Current Resident's monthly fee (in any level of care) that the Trustee determines, in his or her sole discretion, the indigent Resident is unable to pay. All payments made directly to any Participating Current Resident hereunder shall be deducted from such Participating Current Resident's Allowed Refund Claim until the Participating Current Resident's Allowed Refund Claim has been exhausted, at which time all payments from the Residents Trust to the Resident shall cease. Requests for distribution of Residents Trust assets directly to such Participating Current Resident in accordance with Sections 6(a), (b), (c) and (d) hereof (collectively referred to herein as the "Life Care Subsidy") shall be given priority in timing of payment to distributions to Residents who vacate the community.

(e)    Residents who OPT OUT of the Plan Releases pursuant to the terms of the Plan shall receive no distributions from the Residents Trust and shall not be entitled to payment of a Life Care Subsidy from the Residents Trust.

7.    <u>Condition Precedent to Effectiveness.</u> The effectiveness of this Agreement is subject to and conditioned upon entry of a Final Order confirming the Plan by the Bankruptcy Court in a form satisfactory to Lifespace, and the Effective Date of the Plan occurring. If these conditions do not occur (unless waived by all of the Parties), then this Agreement shall become null and void *ab initio*, and no settlement, contribution or distributions will be made to any party pursuant to this Agreement.

8.    <u>Non-Admission.</u> All Parties agree that by entering into this Agreement, no Party acknowledges, admits, concedes, confesses, or recognizes any wrongdoing, liability, or fault whatsoever. Nothing contained herein shall be construed as an admission of liability and neither the Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

connected with the Agreement, shall be deemed or construed in any judicial, non-judicial, arbitration or other proceeding, to be evidence of, or a presumption, concession, or admission by any Party of the truth of any fact alleged or the validity of any claim that has been, could have been or in the future might be asserted against any of the Parties, or of any liability, fault, wrongdoing or otherwise.

9.   <u>Successors and Assigns</u>.  The Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, administrators, successors and assigns. The Trustee of the Residents Trust shall be a third part beneficiary of this Agreement. **Edgemere is expressly allowed, and shall assign all of its rights under this Agreement, to the Residents Trust, including the right to enforce Lifespace's contribution obligations under this Agreement.**

10.   <u>Arms Length Transaction</u>.  The Parties along with the Committee acknowledge and agree that this Agreement is the product of arms-length negotiations, and that it is entered into in good faith, and in the best interests of each of the Parties and the Residents.  Each Party along with the Committee has carefully read the Agreement and the contents thereof are known and understood by each of the Parties along with the Committee.  Each Party along with the Committee has had the opportunity to receive and has received independent legal advice from attorneys of its choice with respect to the advisability of making this settlement and the releases provided herein and with respect to the advisability of executing the Agreement.

11.   <u>Entire Agreement</u>.  The Parties acknowledge and agree that this Agreement together with the Plan constitute the entire agreement between and among the Parties and supersedes all prior agreements and understandings, both written and oral, among the Parties or between any of them with respect to the subject matter hereof; <u>provided</u> that the Agreement shall

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D8F05EE59C53

not be interpreted inconsistently with the terms of the Plan and that the Plan Releases shall not be impaired, diminished or otherwise affected by the terms of the Agreement.

12.    <u>Specific Performance/Covenant Not to Sue/Injunction</u>.  The Parties acknowledge that money damages are an inadequate remedy for breach of this Agreement.  Therefore, the Parties agree that each of them has the right, in addition to any other right that they may have under the Agreement or otherwise (including the right to seek money damages), to specific performance of the Agreement in the event of any breach hereof by any Party.

13.    <u>Waiver</u>.  The failure of any Party to insist on strict adherence to any term of the Agreement shall not be considered a waiver of, or deprive that Party of the right thereafter to insist upon strict adherence to that term or any other term of the Agreement.  Any waiver (express or implied) of any default or breach of the Agreement shall not constitute a waiver of any other or subsequent default or breach.

14.    <u>Further Assurances, Best Efforts, Exclusive Jurisdiction</u>.  Each Party agrees to use its reasonable best efforts to take or cause to be taken all actions and to do or cause to be done all things necessary, proper or advisable under applicable laws and regulations to implement and make effective the settlement transactions contemplated by this Agreement.  Each Party further agrees that the Bankruptcy Court shall retain exclusive jurisdiction to enforce this Agreement in connection with the Plan.

15.    <u>Amendment or Modification</u>.  The Agreement may be amended, modified, altered or supplemented only upon written agreement of all of the Parties.

16.    <u>Binding Effect</u>.  The Agreement is intended to and shall confer upon the Resident Trust and its Trustee all rights to enforce this Agreement and the remedies hereunder.  The Agreement is binding upon and is for the benefit of the Parties, the Residents, the Residents

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934333

Trust, and the Trustee of the Residents Trust and their respective successors, assigns and legal representatives.

17.   Warranty of Authority.     Each Party and the Committee in its respective representative capacity represents and warrants that it is authorized to execute this Agreement on behalf of and to bind the entity on whose behalf its signature is affixed.

(a)   Edgemere represents that it is duly organized, validly existing and in good standing under the laws of the State of Texas and has the requisite power to enter into and perform the Agreement, subject to confirmation of the Plan. The Agreement has been duly authorized by all necessary actions on the part of Edgemere, has been duly executed, and, constitutes a binding agreement, enforceable in accordance with its terms.

(b)   Lifespace represents that it is duly organized, validly existing and in good standing under the laws of Iowa and has the requisite power to enter into and perform the Agreement. The Agreement has been duly authorized by all necessary action on the part of Lifespace, has been duly executed by Lifespace and constitutes a binding agreement of Lifespace, enforceable against Lifespace in accordance with its terms.

(c)   The Parties represent that there are no other persons or entities whose consent is required in order to give full force and effect to the terms of this Agreement.

18.   No Representations or Warranties.   The Parties acknowledge that they are entering into this Agreement without any representations, warranties, express or implied (other than those expressly set forth herein).

19.   Headings.   The headings contained in the Agreement are for convenience of reference purposes only and do not form a part of the Agreement and in no way modify, interpret or construe the agreements and understandings of the Parties contained in the Agreement.

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D5159E554599

20.     <u>Notices</u>.  All notices, requests, claims, or demands hereunder shall be in writing
and shall be delivered by electronic mail or by Federal Express mail, and addressed as follows:

**IF TO THE LIFESPACE:**

> Cooley LLP
> 110 North Wacker Drive
> 42nd Floor
> Chicago, IL 60606
> Attention:  Eric Walker
> ewalker@cooley.com
>
> -and-
>
> Lifespace Communities, Inc.
> 3501 Olympus Blvd, Suite 300
> Dallas, TX 75019
> Attention: Tim Gorman, General Counsel
> Tim.Gorman@lifespacecommunities.com

**IF TO EDGEMERE RELATED PARTIES:**

> Polsinelli PC
> 2950 N. Harwood, Suite 2100
> Dallas, TX 75201
> Attention: Jeremy Johnson and Trinitee Green
> Jeremy.johnson@polsinelli.com
> Tggreen@polsinelli.com

**IF TO RESIDENTS TRUST:**

> Foley & Lardner LLP
> 2021 McKinney Avenue, Suite 1600
> Dallas, TX 75201
> Attention: Stephen McCartin, Mark Moore and Tom Scannell
> smccartin@foley.com
> mmoore@foley.com
> tscannell@foley.com

21.     <u>Counterparts</u>.  The Agreement may be signed in counterparts and delivered by
electronic mail, and so executed, shall constitute one agreement.   The Agreement shall be

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E934353

considered executed and binding on all Parties when all signatories designated herein have executed the Agreement.

22.     Severability.   If one or more of the provisions contained in the Agreement is determined by a court of jurisdiction to be invalid or unenforceable in any respect, the validity and enforceability of the remaining provisions of the Agreement shall not be affected or impaired, and the Parties will in good faith agree upon a valid and enforceable provision that shall be a reasonable substitute for such invalid or unenforceable provision.

23.     Governing Law.   The Agreement, and the rights and obligations of the Parties under this agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to conflict of laws principles, and the Parties consent to jurisdiction in the State of Texas.

24.     Jurisdiction.   Any dispute, difference or controversy arising under the Agreement may be settled and finally determined by the Bankruptcy Court.   The Bankruptcy Court shall retain jurisdiction for purposes of enforcing this Agreement and the Parties consent to the jurisdiction of the Bankruptcy Court for such purpose.   Each Party waives any right to request or obtain a trial by jury in any judicial proceeding pertaining to the matters governed by the Agreement.

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first above written.

DocuSign Envelope ID: 74A6EC57-4EED-404B-A8E1-D0139E904333

**NORTHWEST SENIOR HOUSING CORPORATION:**

By: David Stewart

Its: Director and Chairperson of the Restructuring Committee of the Board of Directors, and not individually

**LIFESPACE COMMUNITIES, INC.:**

By:_____

Its:_____

**Agreed, Acknowledged and Approved as Set Forth Above:**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DEBTORS**

By:_____

Its Chairperson

**NORTHWEST SENIOR HOUSING
CORPORATION:**

By:_____

Its: Director and Chairperson of the
Restructuring Committee of the Board of
Directors, and not individually

**LIFESPACE COMMUNITIES, INC.:**

By:_____

Its: President + CEO_____

**Agreed, Acknowledged and Approved as
Set Forth Above:**

**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF THE
DEBTORS**

By:_____

Its Chairperson

**Exhibit 1**

## Lifespace Trust Contribution Schedule[1]

| Date | Lifespace Contribution Payment | Administrative Expense Payment | Annual Payment |
|---|---|---|---|
| Effective Date Payment | $52,385,094.00 | $75,000.00 | $52,460,094.00 |
| 2024 | $11,395,234.00 | $75,000.00 | $11,470,234.00 |
| 2025 | $10,839,105.00 | $75,000.00 | $10,914,105.00 |
| 2026 | $9,968,057.00 | $75,000.00 | $10,043,057.00 |
| 2027 | $9,005,741.00 | $75,000.00 | $9,080,741.00 |
| 2028 | $7,901,979.00 | $75,000.00 | $7,976,979.00 |
| 2029 | $6,889,084.00 | $75,000.00 | $6,964,084.00 |
| 2030 | $5,966,775.00 | $75,000.00 | $6,041,775.00 |
| 2031 | $5,134,098.00 | $75,000.00 | $5,209,098.00 |
| 2032 | $4,359,664.00 | $75,000.00 | $4,434,664.00 |
| 2033 | $3,674,660.00 | $75,000.00 | $3,749,660.00 |
| 2034 | $3,078,130.00 | $75,000.00 | $3,153,130.00 |
| 2035 | $2,562,942.00 | $75,000.00 | $2,637,942.00 |
| 2036 | $2,129,252.00 | $75,000.00 | $2,204,252.00 |
| 2037 | $1,761,542.00 | $75,000.00 | $1,836,542.00 |
| 2038 | $1,446,837.00 | $75,000.00 | $1,521,837.00 |
| 2039 | $1,173,589.00 | $75,000.00 | $1,248,589.00 |
| 2040 | $931,568.00 | $75,000.00 | $1,006,568.00 |
| 2041 | $734,281.00 | $75,000.00 | $809,281.00 |
| 2042 | $572,976.00 | $75,000.00 | $647,976.00 |
| | $141,910,608.00 | $1,500,000.00 | $143,410,608.00 |

1. Three Residents (identified by KCC, the Debtors' claims agent, as resident numbers 233, 287 and 348) were omitted in calculating the above Contribution Schedule ("Omitted Residents"). Accordingly, Lifespace agrees:

If any Omitted Resident departs the Edgemere community and his or her Refund Trigger Date occurs on or before December 1, 2031, Lifespace shall make an additional contribution to the Residents Trust on December 31, 2031 equal to that Residents Allowed Refund Claim.

` any Omitted Resident departs the Edgemere community and his or her Refund Trigger Date occurs after December 1, 2031, Lifespace shall make an additional contribution to the Residents Trust on December 31, 2041, equal to that Residents Allowed Refund Claim.

# EXHIBIT 2

## RESIDENTS TRUST AGREEMENT

This RESIDENTS TRUST AGREEMENT (the "Trust Agreement") is made and entered into as of _____, 2023, by and among (a) Northwest Senior Housing Corporation and Senior Quality Lifestyles Corporation, in their capacities as debtors and debtors in possession and on behalf of themselves and their respective chapter 11 estates (each a "Debtor" and collectively, the "Debtors"), and (b) _____, as trustee of the Residents Trust (the "Trustee" or the "Trustee"), so long as such individual continues in office, and all other individuals who have been duly elected and qualify as trustee of the Residents Trust hereunder pursuant to Section 1.5 or Article VIII hereof. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

## BACKGROUND

A.    On April 14, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

B.    On December 19, 2022, the Plan Proponents filed their Third Amended Plan of Reorganization of the Plan Sponsors dated December 19, 2022 (as amended, confirmed, and/or modified from time to time, including by the Confirmation Order, the "Plan").

C.    The Plan provides for the creation of a trust on the Effective Date to hold, manage, and administer the Residents Trust Assets and to distribute the proceeds thereof to the holders of Residents Trust Interests (the "Residents Trust Beneficiaries" or "Beneficiaries") in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order.

D.    The Residents Trust is being created on behalf of, and for the benefit of, the Residents Trust Beneficiaries, who are Participating Former Residents and Participating Current Residents of Edgemere that hold Allowed Class 5 and Class 6 Refund Claims under the Plan, and who shall hold beneficial interests in the Residents Trust ("Residents Trust Interests").

E.    The Residents Trust is organized for the sole purpose of collecting and distributing the Residents Trust Assets, and not to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Residents Trust.

F.    This Residents Trust is intended to qualify as a "liquidating trust" under the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder (the "Treasury Regulations"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes pursuant to Treasury Regulations Section 1.671-4(a), with the Residents Trust Beneficiaries treated as the grantors and owners of the Residents Trust.

## TRUST AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, the Debtors and the Trustee agree as follows:

## ARTICLE I.

## DECLARATION OF TRUST

1.1.    <u>Creation of Trust</u>.  As of the Effective Date of the Plan, the Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, and in accordance with the applicable provisions of chapter 11 of the Bankruptcy Code, hereby constitute and create the Residents Trust, which shall bear the name "Edgemere Residents Trust." In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit. The Edgemere Residents Trust shall be governed by the A.R.S. §§ 14-7401 et. seq. as the same may be amended from time to time (the "Trust Code").

1.2.    <u>Purpose of Residents Trust</u>.  The purpose of the Residents Trust is to implement the terms of the Plan on behalf, and for the benefit of, the Residents Trust Beneficiaries, and to serve as a mechanism for collecting the contributions from Lifespace Communities Inc. ("Lifespace") (the "Lifespace Contributions") required under the Plan and Lifespace Settlement and Contribution Agreement dated December 14, 2022 as amended (the "Lifespace Settlement Agreement"), and distributing the Lifespace Contributions and earnings thereon in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in conduct or a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Residents Trust.

1.3.    <u>Transfer of Residents Trust Assets</u>.  On the Effective Date, the Debtors shall transfer, for the sole benefit of the Residents Trust Beneficiaries, pursuant to Bankruptcy Code sections 1123(a)(5)(B) and 1123(b)(3)(B), and in accordance with the Plan and the Confirmation Order, all of the Debtors' rights, title and interests in the Lifespace Settlement Agreement, as amended from time to time, (together with Lifespace Contributions, the "Residents Trust Assets") to the Residents Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial, or otherwise) of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code section 1141(c). In this regard, the Residents Trust Assets will be treated as transferred, for United States federal as well as state and local income tax purposes, in the manner set forth pursuant to Section 5.2 of this Trust Agreement. The transfer of the Residents Trust Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sale, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of all Residents Trust Assets to the Residents Trust, the Debtors shall be discharged and released from all liability with respect to the delivery of such assets, and exculpated as provided in the Plan. The Residents Trust Assets and all other property held from time to time by the Residents Trust under this Trust Agreement and any earnings, including interest, on any of the foregoing are to be applied by the Trustee in accordance with the terms hereof, the Plan, and the Confirmation Order for the benefit of the Residents Trust Beneficiaries, and for no other party, subject to the further covenants, conditions, and terms hereinafter set forth. In the event of any conflict among this Trust

Agreement, the Plan and the Confirmation Order, the provisions of Section 9.6 of this Trust Agreement shall control.

1.4.    <u>Funding of Residents Trust</u>

a)    <u>Residents Trust Operations</u>.  On the Effective Date, the Residents Trust shall be funded by an assignment of all of the Debtors' rights, title and interests in the Lifespace Settlement Agreement. The Lifespace Contibutions thereunder and earnings thereon shall be used exclusively for the following purposes: (i) to maintain the value of the Residents Trust Assets; (ii) to pay the reasonable and necessary administrative expenses of the Residents Trust, including, but not limited to, (a) the Trustee fees, compensation and expenses, (b) the reasonable costs and expenses incurred or anticipated to be incurred by the Trustee (including reasonable fees, costs and expenses incurred or anticipated to be incurred by professionals retained by the Trustee), (c) the reasonable costs and expenses incurred or anticipated to be incurred by the Residents Trust Advisory Board and its members (including reasonable fees, costs and expenses incurred or anticipated to be incurred by professionals retained by the Residents Trust Advisory Board but excluding the fees, costs and expenses of professionals retained by Residents Trust Advisory Board members individually), (d) any taxes imposed on the Residents Trust in respect of the Residents Trust Assets, (e) the reasonable fees and expenses incurred or anticipated to be incurred in connection with, arising out of or related to the Residents Trust Assets and any litigation associated therewith, and (f) other costs and expenses contemplated by this Trust Agreement; and (iii) to make distributions to the Residents Trust Beneficiaries.

b)    <u>Reserve</u>.  Prior to any distributions to the Residents Trust Beneficiaries, the Trustee shall withhold funds for the payment of projected Residents Trust expenses and Life Care Benefits.

1.5.    <u>Appointment and Acceptance of Trustee</u>.  As set forth in the Confirmation Order, the members of the Residents Trust Advisory Board hereby designate _____ to serve as the initial Trustee under the Plan. The Trustee accepts the Residents Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance, and delivery by the Debtors of all of their respective right, title, and interest in the Residents Trust Assets, upon and subject to the terms and conditions set forth herein, in the Plan, and in the Confirmation Order, to the Trustee, on behalf, and for the benefit, of the Residents Trust Beneficiaries. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Residents Trust within the limitations set forth herein, including the Treasury Regulations and the Trust Code, and shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6.    <u>Collection of the Residents Trust Assets</u>.  The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan, the Confirmation Order, and the Lifespace Settlement Agreement, collect Lifespace Contributions and make timely distributions to Residents Trust Beneficiaries in an amount up to their Allowed Refund Claims in the Debtors bankruptcy proceedings in accordance with the terms hereof and the Plan, and shall not unduly prolong the existence of the Residents Trust. The Trustee shall exercise reasonable business judgment and in the collection and distribution of the Residents Trust Assets. The Residents Trust Advisory Board must approve any (i) sale, transfer, assignment, abandonment, or

other disposition of Residents Trust Assets with an asserted value equal to or in excess of $100,000; (ii) settlement or compromise of any claim of the Residents Trust; or (iii) settlement or compromise of an objection to a Class 5 and/or Class 6 Claim which would result in an Allowed Class 5 and/or Class 6 Claim equal to or in excess of $100,000. The Trustee may incur any reasonable and necessary expense in connection with the collection and conversion of the Residents Trust Assets into Cash or in connection with the administration of the Residents Trust and, subject to the approval of the Residents Trust Advisory Board, such expenses shall be deducted from the Residents Trust Assets.

      1.7.   <u>No Reversion to Debtors</u>.  In no event shall any part of the Residents Trust Assets revert to or be distributed to any Debtor.

      1.8.   <u>Incidents of Ownership</u>.  The Residents Trust Beneficiaries shall be the sole beneficiaries of the Residents Trust and the Residents Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan, and in the Confirmation Order, including those powers set forth in Section 6.2 hereof.

## ARTICLE II.

## <u>RESIDENTS TRUST BENEFICIARIES</u>

      2.1.   <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to a Class 5 or Class 6 Claim, or to a Residents Trust Interest or a distribution to a Residents Trust Beneficiary, the Trustee shall be entitled, at the direction and with the approval of the Residents Trust Advisory Board, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee, at the direction and with the approval of the Residents Trust Advisory Board, may elect to make no payment or distribution with respect to the Residents Trust Interest subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of proper jurisdiction) or (ii) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall (x) include a complete release of the Residents Trust and the Trustee, and (y) be subject to the approval of the Residents Trust Advisory Board if the proposed agreement results in a Class 5 or Class 6 Claim Allowed Claim equal to or in excess of $100,000 (the occurrence of either (i) or (ii) of this Section 2.1 being referred to as a "Dispute Resolution"). Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, in accordance with the terms of such Dispute Resolution, the Plan and this Agreement.

      2.2.   <u>Rights of Residents Trust Beneficiaries</u>.  Each Residents Trust Beneficiary shall be entitled to participate in the rights and benefits due to a Residents Trust Beneficiary hereunder according to the terms of its Residents Trust Interest. The Residents Trust Interest of a Residents Trust Beneficiary is hereby declared and shall be, in all respects, personal property. Except as

4878-7882-9640.5

expressly provided hereunder, a Residents Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Residents Trust or the Residents Trust Assets or to any right to call for a partition or division of such assets or to require an accounting. No surviving spouse, heir, or devisee of any deceased Residents Trust Beneficiary shall have any right of dower, homestead, or inheritance, or of partition, or any other right, statutory or otherwise, in the Residents Trust Assets, but the whole title to the Residents Trust Assets shall be vested in the Trustee and the sole interest of the Residents Trust Beneficiaries shall be the rights and benefits given to such person under this Trust Agreement and the Plan.

2.3.    <u>Evidence of Residents Trust Interest</u>.  Ownership of a Residents Trust Interest in the Residents Trust will be evidenced by the allowance of a Claim against the Debtors by a Participating Former Residents and Participating Current Resident pursuant to the terms of the Plan.  Any Participating Former Resident and Participating Current Resident that is a holder of an Allowed Claim under Class 5 or Class 6 of the Plan shall hold a percentage in the Residents Trust Interest (as indicated on Appendix B) equal to the proportion of the underlying Allowed Claim's value to the total value of all Allowed Claims in Class 5 and Class 6 Claims under the Plan.  A Residents Trust Beneficiary shall be deemed a "holder of record" (hereinafter "Holder") of such Residents Trust Beneficiary's Residents Trust Interest(s) for purposes of all applicable United States federal and state laws, rules, and regulations.

2.4.    <u>Transfers of Residents Trust Interests</u>.

a)    <u>General</u>.  Residents Trust Interests shall not be transferable or assignable except by will, intestate succession, or operation of law.

b)    <u>Residents Trust Settlement Interest Registry</u>.  Any transfer or assignment of a Residents Trust Interest by will, intestate succession, or operation of law shall not be effective unless and until such transfer or assignment of the respective interest is recorded in the registry maintained by the Trustee, which shall be completed as soon as practicable after transfer or assignment. Subject to Section 2.4(d), the entries in the Claim Registry shall be conclusive evidence of ownership of a Residents Trust Interest absent manifest error, and the Residents Trust and the Trustee shall treat each person whose name is recorded in the registry pursuant to the terms hereof as the owner of Residents Trust Interests for all purposes of this Trust Agreement, notwithstanding notice to the contrary.  The Residents Trust shall maintain, or cause the agent of the Residents Trust to maintain, a register (which may be electronic) setting forth the names and addresses of the Trustee Beneficiaries, and the amount of their Residents Trust Interests from time to time.

c)    <u>Registration</u>.  If the Trustee, upon advice of counsel, determines that any class of Residents Trust Interests may be subject to registration pursuant to section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter, or an interpretive letter from the Securities and Exchange Commission or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to section 12 of such statute (it being understood and agreed that the Trustee with the approval of the Residents Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such

class). Any expenses that are associated with such application for relief and/or registration shall be deducted from the Residents Trust Assets.

d)    <u>Further Limitations on Transfer</u>.  Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Residents Trust Interests by will, intestate succession, or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.5.    <u>Limited Liability</u>.  No provision of this Trust Agreement, the Plan, or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Residents Trust Beneficiary, shall give rise to any liability of such Residents Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person.  Residents Trust Beneficiaries are deemed to receive the Residents Trust Assets in accordance with the provisions of this Trust Agreement, the Plan, and the Confirmation Order in exchange for the Allowed Class 5 and Class 6 Claims of Participating Former Residents and Participating Current Residents, without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement and the Plan.

ARTICLE III.

<u>**DURATION AND TERMINATION OF LIQUIDATING TRUST**</u>

3.1.    <u>Duration</u>.  The Residents Trust shall become effective upon the Effective Date of the Plan and shall have an initial term of eighteen (18) years from the Effective Date; provided, however, that, if warranted by the facts and circumstances, the Residents Trust Advisory Board may limit or extend the term of the Residents Trust.

3.2.    <u>Dissolution of the Residents Trust</u>.  The Trustee and the Residents Trust shall be discharged or dissolved earlier, as the case maybe, on the earlier to occur of (i) all of the Residents Trust Assets having been distributed pursuant to the Plan and this Trust Agreement, (ii) the Trustee having determined, with the approval of the Residents Trust Advisory Board, that the administration of any remaining Residents Trust Assets is not likely to yield sufficient additional Residents Trust proceeds to justify further pursuit, or (iii) conclusion of the Residents Trust as provided by Section 4.1.

3.3.    <u>Continuation of Residents Trust for Winding Up</u>.  After the dissolution of the Residents Trust and solely for the purpose of liquidating and winding up the affairs of the Residents Trust, the Trustee shall continue to act as such until its duties have been fully performed. Upon distribution of all the Residents Trust Assets, the Trustee shall retain the books, records, and files that shall have been delivered to or created by the Trustee. All such records and documents may be destroyed at any time following the date that is three (3) years after the final distribution of the Residents Trust Assets.  Nothing herein shall be deemed to abridge any agreement(s) to which the Trustee may be party that expressly provides for further retention of such documents and records.

## ARTICLE IV.

## ADMINISTRATION OF LIQUIDATING TRUST

4.1.    <u>Payment of Trustee Fees, Expenses, and Liabilities</u>.  Except as otherwise provided herein, the Trustee shall use proceeds from the Residents Trust Assets (i) to pay compensation to the Trustee as approved by the Residents Trust Advisory Board, (ii) to pay reasonable costs and expenses of the Residents Trust that are incurred (including any taxes imposed on the Residents Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trustee professionals in connection with the administration and liquidation of the Residents Trust Assets, as provided in Section 6.7 herein, and the preservation of books and records of the Residents Trust); (iii) to satisfy other obligations or other liabilities incurred or assumed by the Residents Trust (or to which the Residents Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, or this Trust Agreement, including fees and costs incurred in connection with the collection protection, preservation, liquidating, and distribution of the Residents Trust Assets and the costs of investigating, prosecuting, resolving, or settling any litigation or cause of action; (iv) as reasonably necessary to meet contingent liabilities and to maintain the value of the Residents Trust Assets during collection and liquidation; and (v) to satisfy any other obligations of the Residents Trust expressly set forth in the Plan, this Trust Agreement, and the Confirmation Order.

4.2.    <u>Distributions</u>.

a)    <u>Generally</u>.  Except as otherwise provided in the Plan or this Trust Agreement, the Trustee shall make distributions of Residents Trust Assets to the Residents Trust Beneficiaries qualifying to receive distributions from the Residents Trust in the amount of their respective Allowed Refund Claims when the Trustee, in its sole discretion, determines such distribution appropriate and required pursuant to the terms and provisions of the Plan, the Confirmation Order and this Agreement, subject to the Trustee's duty to confer on such matters with the Residents Trust Advisory Board.  The Trustee shall have discretion to determine when a Refund Trigger Date has occurred in unique and unforeseen circumstances, subject to the Trustee's duty to confer on such matters with the Residents Trust Advisory Board. The Trustee may postpone any distribution if the Trustee determines that a Distribution is impracticable under the circumstances, or the amount of such distribution would be too small to justify the administrative costs associated with making it. The Trustee shall not unduly prolong the duration of the Residents Trust.

b)    <u>Trust Interests; Allocation and Payment of Distributions</u>.  Each Residents Trust Beneficiary's (i) share of the Residents Trust Interests (including any Cash and other property to be received on account of any Residents Trust Interest) shall be owned by the Residents Trust Beneficiaries, and (ii) share of the Residents Trust Assets shall be allocated and distributed to the Residents Trust Beneficiaries, in each case in accordance with the Plan, the Confirmation Order and this Trust Agreement.

c)    <u>De Minimis Distributions</u>.  No Distribution shall be required to be made pursuant to the Plan and this Trust Agreement to any Residents Trust Beneficiary unless such Residents Trust Beneficiary is to receive in such Distribution at least $500.00, or unless such Distribution is the final distribution to such Residents Trust Beneficiary pursuant to the Plan and

this Trust Agreement. Any such distribution shall be retained by the Trustee and invested as provided in the Plan and this Trust Agreement. Any distribution not made to such Residents Trust Beneficiary, shall be held in trust for the relevant Residents Trust Beneficiary until the earlier of (x) the date the next distribution made to such Residents Trust Beneficiary; provided, however, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $500.00, or (y) is the final distribution to such Residents Trust Beneficiary.

4.3.    <u>Undeliverable Distributions</u>.  If the distribution to any Residents Trust Beneficiary is returned to the Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Residents Trust Beneficiary unless and until the Trustee is notified in writing of such Residents Trust Beneficiary's then-current address, at which time all missed distributions shall be made to such Residents Trust Beneficiary without interest.  The Trustee and the Residents Trust shall not be under any obligation to attempt to determine a Residents Trust Beneficiary's then-current address.

4.4.    <u>Treatment of Unclaimed Distributions</u>.  Any Residents Trust Beneficiary that does not assert a claim for an unclaimed distribution or negotiate a distribution within three (3) after an attempted distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an unclaimed distribution against the Debtors, the Trustee, the Residents Trust, and their respective agents, attorneys, representatives, employees or independent contractors, or any of its and their property. In such cases, any Cash otherwise reserved for unclaimed distributions shall become the property of the Residents Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed pursuant to the terms of this Agreement. Nothing contained in the Plan or this Residents Trust Agreement shall require the Trustee to attempt to locate any Residents Trust Beneficiary; provided, however, that the Trustee, in its sole discretion, may publish notice of unclaimed distributions.

4.5.    <u>Remaining Residents Trust Assets Upon Dissolution of the Residents Trust.</u>  The Residents Trust Beneficiaries shall receive distributions in an amount up to, but not exceeding, the amount of their respective Allowed Refund Claims, with no interest thereon. All assets, if any, remaining in the Residents Trust after distributions to Residents Trust Beneficiaries as required under the Plan, the Confirmation Order, and this Agreement may be, at the discretion of the Residents Trust Advisory Board, either (i) distributed to the then owner of the Edgemere Community to be used for the benefit of residents at Edgemere, or (ii) donated to any other charitable organization.

4.6.    <u>Setoffs of Lifecare Benefits</u>.  Pursuant to the terms of the Plan, the Trustee may set off against any  the distributions to be made to a Residents Trust Beneficiary pursuant to the Plan on account thereof (before any distribution is made on account of such Residents Trust Interest by the Trustee), all amounts advanced to such Residents Trust Beneficiary as a Life Care Benefit.

4.7.    <u>Compliance with Laws</u>.  Any and all distributions of Residents Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws, except as otherwise set forth in this Trust Agreement.

4.8.    <u>Fiscal Year</u>.  Except for the first and last years of the Residents Trust, the fiscal year of the Residents Trust shall be the calendar year. For the first and last years of the Residents Trust, the fiscal year of the Residents Trust shall be such portion of the calendar year that the Residents Trust is in existence.

4.9.    <u>Books and Records</u>.   The Trustee shall retain and preserve the Debtors' books, records, and files that have been delivered to or created by the Trustee. Subject to Section 3.3 hereof, the Trustee shall maintain, in respect of the Residents Trust and the Residents Trust Beneficiaries and all other parties who are to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Residents Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Residents Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including to applicable tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Residents Trust, or as a condition for making any payment or distribution out of the Residents Trust Assets. The Trustee shall provide any member of the Residents Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with five (5) days' advance notice. Residents Trust Beneficiaries shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; provided, that, if so requested, all costs associated with such inspection shall be paid in advance by such requesting Residents Trust Beneficiary and such Residents Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10.    <u>Cash Payments</u>.   All distributions required to be made by the Trustee to the Residents Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Residents Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11.    <u>Insurance</u>.  The Residents Trust may, to the extent deemed necessary or advisable by the Trustee, maintain customary insurance coverage for the protection of the Trustee and the members.

4.12.    <u>Reports</u>.

a)    The Trustee shall deliver reports to members of the Residents Trust Advisory Board not later than thirty (30) days following the end of each fiscal year. Such reports shall specify in reasonable detail (i) the status of any causes of action, claims, and litigation involving the Residents Trust or the Residents Trust Assets, including any settlements entered into by the Residents Trust, (ii) the costs and expenses of the Residents Trust that are incurred (including any actual reasonable out-of-pocket fees and expenses incurred by Trustee professionals in connection with the administration and liquidation of the Residents Trust Assets during the preceding fiscal year), (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv)

the amount of Cash and other assets received by the Residents Trust during the prior fiscal year, (v) the aggregate amount of Cash and other assets received by the Residents Trust since the Effective Date, (vi) the aggregate amount of distributions from the Residents Trust to the Residents Trust Beneficiaries since the Effective Date, and (vii) such other information as the Residents Trust Advisory Board may reasonably request from time to time. The Trustee shall also timely prepare, file, and distribute such additional statements, reports, and submission (A) as may be necessary to cause the Residents Trust and the Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Residents Trust Advisory Board.

## ARTICLE V.

## **TAX MATTERS**

5.1.    <u>Tax Treatment</u>.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustee and the Residents Trust Beneficiaries) will treat the Residents Trust as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.

5.2.    <u>Residents Trust Assets Treated as Owned by Residents Trust Beneficiaries</u>.  For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, and the Residents Trust Beneficiaries) generally will be required to treat the transfer of the Residents Trust Assets to the Residents Trust as (1) a transfer of the Residents Trust Assets (subject to any obligations relating to those assets) directly to the Residents Trust Beneficiaries and, to the extent Residents Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve, followed by (2) the transfer by such beneficiaries to the Residents Trust of the Residents Trust Assets (other than the Residents Trust Assets allocable to the Disputed Claims Reserve) in exchange for Residents Trust Interests.  Accordingly, the Residents Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Residents Trust Assets (other than such Residents Trust Assets as are allocable to the Disputed Claims Reserve, discussed below) and the earnings thereon. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

5.3.    <u>Tax Reporting</u>.

a)    The Trustee shall file (or cause to be filed) all Tax Returns for the Residents Trust treating the Residents Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article V. The Trustee also will annually send to each Residents Trust Beneficiary a separate statement regarding the receipts and expenditures of the Residents Trust as relevant for United States federal income tax purposes and will instruct all such Residents Trust Beneficiaries to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such Residents Trust Beneficiary's tax return preparer, with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Residents Trust that is required by any governmental unit.

b)    Taxable income and taxable losses shall be allocated to each Residents Trust Beneficiary in proportion to the amount of their unpaid Allowed Refund Claim as of December

31st of each taxable year divided by the total unpaid Allowed Refund Claims of all Residents Trust Beneficiaries as of December 31st of each taxable year.

        c)     The Trustee shall be responsible for payment, out of the Residents Trust Assets, any taxes imposed on the Residents Trust or its assets.

        d)     The Trustee may request an expedited determination of taxes of the Residents Trust under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Residents Trust for all taxable periods through the dissolution of the Residents Trust.

    5.4.  <u>Tax Withholdings by Trustee</u>.  The Trustee shall withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the Residents Trust Beneficiaries. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such Residents Trust Beneficiary for all purposes of the Trust Agreement. The Trustee shall be authorized to collect such tax information from the Residents Trust Beneficiaries (including without limitation, social security numbers or other tax identification numbers) as the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement. In order to receive distributions under the Plan, all Residents Trust Beneficiaries shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. This identification requirement generally applies to all Residents Trust Beneficiaries, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any Residents Trust Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such Residents Trust Beneficiary's Residents Trust Interests as disputed; provided, however, that, upon the delivery of such information by a Residents Trust Beneficiary, the Trustee shall make such distribution to which the Residents Trust Beneficiary is entitled, without additional interest occasioned by such Residents Trust Beneficiary's delay in providing tax information; and, provided, further, that, if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the Residents Trust Beneficiary; and, provided, further, that, if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such Residents Trust Beneficiary and the Trustee is later held liable for the amount of such withholding, such Residents Trust Beneficiary shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such Residents Trust Beneficiary).

ARTICLE VI.

<strong><u>POWERS AND LIMITATIONS ON THE TRUSTEE</u></strong>

    6.1.  <u>Trustee</u>.  References herein to the Trustee shall refer to the individual serving as the Trustee solely in its capacity as trustee hereunder. Subject to Article VIII hereof, the Trustee shall hold office until the termination of the Residents Trust in accordance with the terms set forth herein.

6.2.   <u>Powers of the Trustee</u>.

a)     Pursuant to the terms of the Plan, the Confirmation Order, and this Trust Agreement, the Trustee shall have various powers, duties, and responsibilities concerning the collection of Residents Trust Assets, the prosecution of litigation claims to collect Residents Trust Assets, the resolution of disputed Class 5 and Class 6 claims against the Debtors' Estates, the administration of the Residents Trust and the Residents Trust Assets, and to make Distributions to the Residents Trust Beneficiaries in accordance with the Plan, the Confirmation Order, and this Trust Agreement.

b)     The Trustee shall have only such rights, powers, and privileges expressly set forth in the Confirmation Order, the Plan, and this Trust Agreement and as otherwise provided by applicable law. Subject to the oversight and approvals by and of the Residents Trust Advisory Board when required herein, the Trustee shall be expressly authorized to undertake the following actions:

i.     To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtors or any trustee appointed for any Debtor to collect amounts owed by Lifespace under the Lifespace Settlement Agreement;

ii.     To open and maintain bank and other deposit accounts, escrows and other accounts, calculate and make distributions of Residents Trust Assets as provided for or contemplated by the Plan, the Confirmation Order, and this Trust Agreement, and take other actions consistent with the Plan and the implementation thereof in the name of the Trustee, even in the event of the dissolution of the Debtors;

iii.     To collect, sell, liquidate or otherwise dispose of all Residents Trust Assets pursuant to the Plan, subject to approval by the Residents Trust Advisory Board in the event that a particular Residents Trust Asset is valued at or in excess of $100,000 and, to make distributions of Residents Trust Assets;

iv.     Subject to the prior approval of the Residents Trust Advisory Board to borrow funds, and to also take all actions necessary to preserve and maximize the value of the Residents Trust Assets;

v.     To object to any Class 5 or Class 6 Claims asserted in the Debtors bankruptcy proceedings (disputed or otherwise), and to defend, compromise and/or settle any Class 5 and Class 6 Claims prior to or following objection without the necessity of approval of the Court, subject to approval by the Residents Trust Advisory Board if any such settlement or compromise results in an Allowed Class 5 and Class 6 Claim equal to or in excess of $100,000;

vi.     To make decisions, after consultation with and approval by the Residents Trust Advisory Board, regarding the retention or engagement of professionals, employees and consultants (generally, "Residents Trust Professionals") by the Residents Trust and to pay, from the Residents Trust Assets, the charges incurred by the Residents Trust on or after the Effective Date for services of professionals upon approval of the Residents Trust Advisory Board, without application to the Court (nothing herein shall prohibit the retention of Foley & Lardner

LLP or Ankura, former professionals retained by the Official Unsecure Creditors Committee, as professionals for the Residents Trust);

vii.    To determine, after consultation with the Residents Trust Advisory Board, whether a Refund Trigger Date has occurred or should be deemed to have occurred in unique and unforeseen circumstances;

viii.    To cause, on behalf of the Residents Trust, to prepare and file all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law;

ix.    To invest Cash in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Court as deemed appropriate by the Trustee in accordance with the investment and deposit guidelines set forth in this Trust Agreement;

x.    To enter into any agreement or execute any instrument or document required by or consistent with the Plan and perform all of the obligations of the Trustee hereunder;

xi.    To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization approved by the Residents Trust Advisory Board, any Residents Trust Assets that the Trustee determines too impractical to distribute, provided, however, that Court approval, upon notice and a hearing, shall be required for any abandonment or donation of assets with a value of ten thousand dollars ($10,000) or more;

xii.    To use Residents Trust Assets to purchase or create and maintain all appropriate insurance policies, bonds or other means of assurance and protection of the Residents Trust Assets and pay all reasonable insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Trustee, and if appropriate, the Residents Trust Advisory Board;

xiii.    To implement and enforce all provisions of the Plan, subject to the advice of the Residents Trust Advisory Board;

xiv.    To maintain appropriate books and records (including financial books and records) to govern the collection and distribution of the Residents Trust Assets, provided, however, that any abandonment or destruction of books and records shall require Residents Trust Advisory Board approval, unless otherwise provided herein;

xv.    Subject to approval of the Residents Trust Advisory Board, to dissolve the Residents Trust if the Trustee determines, in reasonable reliance on such professionals as it may retain, that the expense of administering the Residents Trust so as to make a final distribution to Trust Beneficiaries is likely to exceed the value of the remaining Residents Trust Assets; and

xvi.    To do all other acts or things consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

c)      Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power, or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines that it is necessary, appropriate, or desirable, the Trustee will have the right to submit to the Bankruptcy Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Residents Trust, or the Residents Trust Assets, including the administration and distribution of Residents Trust Assets and the termination of the Residents Trust. Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.3.   <u>Limitations on Trustee</u>.

a)      The Trustee shall, on behalf of the Residents Trust, hold the Residents Trust out as a trust in the process of collection and liquidation and not as an investment company. The Trustee shall be restricted to the liquidation of the Residents Trust Assets on behalf, and for the benefit, of the Residents Trust Beneficiaries and the distribution and application of the Residents Trust Assets for the purposes set forth in, and the conservation and protection of the Residents Trust Assets and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan, and the Confirmation Order. In no event shall the Trustee receive any property, make any distribution, satisfy or discharge any claims, expenses, charges, liabilities and obligations or otherwise take any action which would jeopardize the status of the Residents Trust as a "liquidating trust" for United States federal income tax purposes within the meaning of Treasury Regulations Section 301.7701-4(d). This limitation shall apply irrespective of whether the conduct of any such actions is deemed by the Trustee to be necessary or appropriate for the conservation and protection of the Trust Assets.

b)      Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall submit to the Residents Trust Advisory Board for its approval the following matters and any other matters that expressly or reasonably require the approval of the Residents Trust Advisory Board pursuant to the other terms of this Trust Agreement:

i.      The retention or engagement of any Trustee professionals;

ii.     Any payment to the Trustee or any Trustee professionals for fees and expenses in excess of twenty thousand dollars ($20,000.00);

iii.    Any settlement of any litigation or causes of action involving an amount in controversy equal to or in excess of $100,000;

iv.     Any borrowing of funds;

v.      Any incurrence of any cost, expense, or fee in excess of $100,000; and

vi.      The dissolution of the Residents Trust.

The foregoing shall not limit the Trustee's ability to make determinations and take actions regarding compliance with tax withholding requirements (including remittances).

6.4.    Establishment of Residents Trust Advisory Board.

a)      The "Residents Trust Advisory Board" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the collection and distribution of the Residents Trust Assets by the Trustee in accordance with this Trust Agreement, the Plan, and the Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement.

b)      The Residents Trust Advisory Board shall consist of three (3) members.

c)      The authority of the members of the Residents Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Residents Trust is dissolved in accordance with Section 3.2 hereof. The service of the members of the Residents Trust Advisory Board shall be subject to the following:

i.      the members of the Residents Trust Advisory Board shall serve until death or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

ii.      a member of the Residents Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Residents Trust Advisory Board. Such resignation shall be effective when a successor is appointed as provided herein;

iii.      a member of the Residents Trust Advisory Board may be removed by unanimous vote of the other members for (a) fraud or willful misconduct in connection with the affairs of the Residents Trust or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a). Such removal shall be effective only upon the earlier of (a) acceptance of such removal by the member, or (b) an order of the Bankruptcy Court requiring such removal;

iv.      in the event of a vacancy in a member's position (whether by removal, death, or resignation) and such member is not replaced pursuant to Section 6.4(c)(iv), the Trustee shall appoint as successor member who is willing to serve on the Residents Trust Advisory Board and that is reasonably acceptable to the remaining members; and

v.      immediately upon appointment of any successor member of the Residents Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Residents Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Residents Trust Advisory Board without any further act; and the successor member of the Residents Trust Advisory Board shall not be liable personally for any act or omission of the phredecessor member of the Residents Trust Advisory Board.

4878-7882-9640.5

vi.    Notwithstanding anything in this Trust Agreement to the contrary, the Residents Trust Advisory Board shall not take any action which will cause the Residents Trust to fail to qualify as a "liquidating trust" and taxed as a grantor trust for United States federal income tax purposes.

vii.    A quorum for meetings of the Residents Trust Advisory Board shall consist of a majority of the members of the Residents Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a member of the Residents Trust Advisory Board shall be deemed present if a representative of the member is attending in person, by telephone, or by proxy; provided, further, however, that to the extent practicable, reasonable notice of a meeting must be given to all members of the Residents Trust Advisory Board.

viii.    Except as expressly provided herein, the affirmative vote of a majority of the members of the Residents Trust Advisory Board shall be the act of the Residents Trust Advisory Board with respect to any matter that requires the determination, consent, approval, or agreement of such board. Any or all of the members of the Residents Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the Plan) for the holding thereof. Any member of the Residents Trust Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting. In all matters submitted to a vote of the Residents Trust Advisory Board, each Residents Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Residents Trust Advisory Board member or by proxy. In a matter in which the Trustee cannot obtain direction or authority from the Residents Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Bankruptcy Court; provided, however, that any member of the Residents Trust Advisory Board may oppose such motion.

ix.    Any action required or permitted to be taken by the Residents Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Residents Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Residents Trust Advisory Board and filed with the minutes or proceedings of the Residents Trust Advisory Board.

x.    Any member of the Residents Trust Advisory Board shall be reimbursed by the Trustee from the Residents Trust Assets for its actual, reasonable out-of-pocket expenses incurred for serving on such board, such as travel costs etc. (but excluding the fees, costs, and expenses of professionals retained by Residents Trust Advisory Board members individually), after submission of reasonably detailed receipts or invoices evidencing such expenses. Except as provided for in this Section 6.4, the members of the Residents Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members. Except as provided for in this Section 6.4, the members of the Residents Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members.

6.5.    <u>Resolution of Claims</u>.

a)    Unless otherwise provided in the Plan, from and after the Effective Date, the Trustee shall have authority to object to Class 5 and Class 6 Claims (in consultation with the Residents Trust Advisory Board) and to have the Bankruptcy Court determine the amount and treatment of any Class 5 and Class 6 Claim. Subject to Section 6.3 herein, from and after the Effective Date, the Trustee may settle or compromise any Disputed Class 5 and Class 6 Claim with or without approval of the Court.

b)    Subject to Section 6.3 herein, the Trustee shall have the authority to retain counsel and other professionals in conjunction with the resolution of Claims pursuant to this Section 6.5. The reasonable fees and expenses of such counsel and professionals as approved by the Residents Trust Advisory Board shall be paid and deducted from the Residents Trust Assets.

6.6.    <u>Actions Taken on Other Than a Business Day</u>.  In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.7.    <u>Agents, Employees, and Professionals</u>.

a)    Subject to approval by the Residents Trust Advisory Board, the Residents Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trustee Professionals deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Residents Trust, on such terms as he Trustee deems appropriate.

b)    After the Effective Date, Trustee Professionals shall be required to submit reasonably detailed invoices on a monthly basis, or as may otherwise be agreed by the Trustee, to the Trustee, including in such invoices a description of the work performed, who performed such work, and, if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. Subject to the approval of the Residents Trust Advisory Board, the Trustee shall pay such invoices thirty (30) days after such invoices are received. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trustee Professionals, either the Trustee, with the approval of the Residents Trust Advisory Board, or the affected party may ask the Bankruptcy Court to resolve the dispute.

c)    All payments to Trustee Professionals shall be paid out of the Residents Trust Assets.

6.8.    <u>Investment of Residents Trust Monies</u>.  All monies and other assets received by the Trustee as Residents Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.8) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Residents Trust Beneficiaries, and shall not be segregated from other Residents Trust Assets, unless and to the extent required by the Plan. The Trustee shall promptly invest any such monies (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.8, but shall otherwise

4878-7882-9640.5

have no liability for interest or income on any monies received by the Residents Trust hereunder and held for distribution or payment to the Residents Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Residents Trust shall be administered in accordance with the general duties and obligations hereunder. Unless otherwise approved by the Residents Trust Advisory Board, the right and power of the Trustee to invest the Residents Trust Assets, the proceeds thereof, or any income earned by the Residents Trust, shall be limited to the right and power to (i) invest such Residents Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in short-term direct obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (ii) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings (including but not limited to Revenue Procedure 82-58, Revenue Procedure 91-15, and Revenue Procedure 94-45), other IRS pronouncements or otherwise.

6.9.    Termination.   The duties, responsibilities, and powers of the Trustee and the Residents Trust Advisory Board shall terminate on the date the Residents Trust is wound up and dissolved in accordance with _____ law pursuant to Section 3.2 hereof, under applicable law and in accordance with this Trust Agreement and the Plan; provided, however, that Sections 7.2, 7.3, 7.4, 7.5, and 7.6 hereof shall survive such termination, dissolution, and entry.

## ARTICLE VII.

## **CONCERNING THE RESIDENTS TRUST TRUSTEE AND**

## **RESIDENTS TRUST ADVISORY BOARD**

7.1.    Reliance by the Trustee and the Members of the Residents Trust Advisory Board. Except as otherwise provided in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee and the members of the Residents Trust Advisory Board may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.

7.2.    Liability to Third Persons.   The Trustee, the Trustee Professionals, and the members of the Residents Trust Advisory Board shall not be subject to any personal liability whatsoever, in tort, contract, or otherwise, to any person (including, in the case of the Trustee and members of the Residents Trust Advisory Board, to any Trustee Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Residents Trust Assets or the affairs of the Residents Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a Final Order of the Bankruptcy Court to be due to their respective gross negligence, intentional fraud, criminal conduct, or willful

misconduct ("Indemnifiable Claims"), and all such Persons shall look solely to the Residents Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Residents Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 7.2 shall be deemed to release any Residents Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.h

7.3.    <u>Nonliability of Trustee and Residents Trust Advisory Board for Acts of Others</u>. Except as provided herein, nothing contained in this Trust Agreement, the Plan, or the Confirmation Order shall be deemed to be an assumption by the Trustee, the Residents Trust Advisory Board (or its members), or the Trustee Professionals of any of the liabilities, obligations, or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Trustee to assume or accept any such liability, obligations, or duty. Any successor Trustee, or Residents Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement of representation made as to the assets comprising the Residents Trust Assets or as to any other fact bearing upon the prior administration of the Residents Trust, so long as it has a good faith basis to do so. The Trustee, and the Residents Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue. The Trustee or any successor Trustee, and Residents Trust Advisory Board members shall not be liable for any act or omission of any predecessor Trustee, or Residents Trust Advisory Board member, nor have a duty to enforce any claims against any predecessor Trustee, or Residents Trust Advisory Board member on account of any such act or omission, unless directed to do so by the Residents Trust Advisory Board. No provision of this Trust Agreement shall require the Trustee to expend or risk his or her personal funds or otherwise incur any financial liability in the performance of his or her rights or powers hereunder if the Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him or her.

7.4.    <u>Exculpation</u>. As of the Effective Date, the Trustee, the Trustee professionals, and any member of the Residents Trust Advisory Board shall be and hereby are exculpated by all Persons, including Residents Trust Beneficiaries, and other parties-in-interest, from any and all claims, causes of action, and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement, or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to have arisen out of their own respective intentional fraud, criminal conduct, gross negligence, or willful misconduct. No Residents Trust Beneficiary, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trustee, the Residents Trust, the employees, professionals, or representatives of either the Trustee or the Residents Trust (including the Trustee Professionals) or the members of the Residents Trust Advisory Board, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order, and this Trust Agreement in good faith. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court or the Residents Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Residents Trust Advisory Board, whether or not

4878-7882-9640.5

express, which would result in a change to the distribution provisions of this Trust Agreement and the Plan.

7.5.    <u>Duties of the Members of the Residents Trust Advisory Board</u>.  The members of the Residents Trust Advisory Board shall owe a fiduciary duty to Residents Trust Beneficiaries as a whole and not to any individual Residents Trust Beneficiary.  Members of the Residents Trust Advisory Board shall owe the same duties to the Residents Trust Beneficiaries as the duties owed by members of a committee established by Section 1102(a) of the Bankruptcy Code to their constituents.

7.6.    <u>Indemnity</u>.  The Trustee, the employees of the Residents Trust, the members of the Residents Trust Advisory Board, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, and principals, including the Trustee Professionals (collectively, the "Indemnified Parties") shall be indemnified by the Residents Trust solely from the Residents Trust Assets for any losses, claims, damages, liabilities, and expenses occurring after the Effective Date, including reasonable attorneys' fees, disbursements, and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding, or investigation brought by or threatened against one or more of the Indemnified Parties on account of the acts or omissions in their capacity as, or on behalf of, the Trustee or a member of the Residents Trust Advisory Board; provided, however, that the Residents Trust shall not be liable to indemnify any Indemnified Party for any act or omission arising out of such Indemnified Party's respective, fraud or willful misconduct as determined by a Final Order of the Bankruptcy Court. Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain advances from the Residents Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such, except for any actions or omissions arising from their own respective willful misconduct or fraud; provided, however, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Residents Trust immediately upon the entry of a Final Order finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.6. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.7.    <u>Compensation and Expenses</u>.  Subject to the approval of the Residents Trust Advisory Board, the Trustee shall receive compensation for its services, to be paid out of the Residents Trust Assets. In addition, the Trustee shall be entitled, with the approval of the Residents Trust Advisory Board to reimburse itself from the Residents Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan.

## ARTICLE VIII.

## <u>SUCCESSOR RESIDENTS TRUSTEE</u>

8.1.    <u>Resignation</u>.  The Trustee may resign from the Residents Trust by giving at least sixty (60) days prior written notice thereof to each member of the Residents Trust Advisory Board.

4878-7882-9640.5

Such resignation shall become effective on the later to occur of (a) the date specified in such written notice, and (b) the effective date of the appointment of a successor Trustee in accordance with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2.    <u>Removal</u>.   At any time upon the request of the Residents Trust Advisory Board through a motion filed in the Bankruptcy Court, the Bankruptcy Court may remove the Trustee, including any successor Trustee, for cause.  For purposes of this Section 8.2, "cause" shall mean: (a) an act of fraud, embezzlement, or theft in connection with the Trustee's duties or in the course of her employment in such capacity, (b) the intentional wrongful damage to the Residents Trust Assets, (c) the intentional wrongful disclosure of confidential information of the Residents Trust resulting in material harm to the Residents Trust, or (d) gross negligence by the Trustee in connection with the performance of his or her duties under this Residents Trust Agreement.  Unless the Bankruptcy Court orders immediate removal, the Trustee shall continue to serve until a successor Trustee is appointed, and such appointment becomes effective, in accordance with Section 8.2 hereof.  If the Trustee is removed for cause, such Trustee shall not be entitled to any accrued but unpaid fees, expenses or other compensation under this Residents Trust Agreement or otherwise.  If the Trustee is unwilling or unable to serve for any other reason whatsoever other than for "cause," subject to a final accounting, such Trustee shall be entitled to all accrued but unpaid fees, expenses, and other compensation, to the extent incurred, arising or relating to events occurring before his or her removal or resignation, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Trustee.

8.3.    <u>Effect of Resignation or Removal</u>.   The resignation, removal, incompetency, bankruptcy, or insolvency of the Trustee shall not operate to terminate the Residents Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan, or the Confirmation Order or invalidate any action theretofore taken by the Trustee. All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency, or removal of the Trustee shall be paid from the Residents Trust, unless such fees and expenses are disputed by (a) the Residents Trust Advisory Board or (b) the successor Trustee, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the Residents Trust Assets. In the event of the resignation or removal of the Trustee, such Trustee shall: (i) promptly execute and deliver such documents, instruments, and other writings as may be reasonably requested by the successor Trustee or directed by the Bankruptcy Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records, and other writings related to the Residents Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

8.4.    <u>Appointment of Successor</u>.   In the event of the death, resignation, removal, incompetency, bankruptcy, or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Residents Trust Advisory Board. In the event that a successor Trustee is not appointed within thirty (30) days after the date of such vacancy, the Bankruptcy Court, upon its own motion or the motion of a Residents Trust Beneficiary or any member of the Residents Trust Advisory Board, shall appoint a successor Trustee.

4878-7882-9640.5

8.5. <u>Acceptance of Appointment by Successor Trustee</u>. Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the Residents Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee. Thereupon, such successor Trustee shall, without any further act, become vested with all the duties, powers, rights, title, discretion, and privileges of its predecessor in the Residents Trust with like effect as if originally named Trustee and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The resigning or removed Trustee shall duly assign, transfer, and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion, and privileges of such resigning or removed Trustee.

ARTICLE IX.

<u>**MISCELLANEOUS PROVISIONS**</u>

9.1. <u>Governing Law</u>. This Trust Agreement shall be governed by and construed in accordance with the laws of the State of _____, without giving effect to rules governing the conflict of laws.

9.2. <u>Jurisdiction</u>. Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction over the Residents Trust and the Trustee, including the administration and activities of the Residents Trust and the Trustee, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction; provided, however, that notwithstanding the foregoing, the Trustee shall have power and authority to prosecute any Cause of Action in any court of competent jurisdiction (including the Bankruptcy Court).

9.3. <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.4. <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

      i.      If to the Trustee:

      ii.     If to the Debtors:

iii.    If to the members of the Residents Trust Advisory Board:

9.5.    <u>Headings</u>.    The headings contained in this Trust Agreement are solely for convenience and reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.6.    <u>Relationship to the Plan</u>.    The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is a conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) this Trust Agreement, (2) the Confirmation Order, and (3) the Plan.

9.7.    <u>Entire Trust Agreement</u>.    This Trust Agreement (including the recitals and annex hereto), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter hereof.

9.8.    <u>Cooperation</u>.    The Debtors shall turn over or otherwise make available to the Trustee at no cost to the Residents Trust or the Trustee, all books and records reasonably required by the Trustee to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Trustee in carrying out its duties hereunder, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' books and records.

9.9.    <u>Amendment and Waiver</u>.    Any provision of this Trust Agreement may be amended or waived by the Trustee with the consent of all members of the Residents Trust Advisory Board provided, however, that no change may be made to this Residents Trust Agreement that would adversely affect the distributions to be made under this Residents Trust Agreement to any of the Residents Trust Beneficiaries, or adversely affect the United States federal income tax status of the Residents Trust as a "liquidating trust." Notwithstanding this Section 9.9, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Residents Trust to liquidate in an expeditious but orderly manner the Residents Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.2 hereof.

9.10.    <u>Confidentiality</u>.    The Trustee and its employees, members, agents, professionals, and advisors, including the Trustee Professionals, and each member of the Residents Trust Advisory Board (each a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the Residents Trust Assets relates; provided, however, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process including subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to this clause (b), such Confidential Party shall

promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Residents Trust Advisory Board in the case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Residents Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

9.11.   <u>Meanings of Other Terms</u>.   Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations, and other entities. All references herein to Articles, Sections, and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute, or regulation, refer to the corresponding Articles, Sections, and other subdivisions of this Trust Agreement, and the words herein and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section, or subdivision of this Trust Agreement. The term "including" shall mean "including, without limitation."

9.12.   <u>Counterparts</u>.   This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed in original, but such counterparts shall together constitute but one and the same instrument. A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

9.13.   <u>Intention of Parties to Establish a Liquidation Trust</u>.   This Trust Agreement in intended to create a "liquidating trust" for United States federal income tax purposes within the meaning of Treasury Regulations section 301.7701-4(d), and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively. This Trust Agreement is not intended to create and shall not be interpreted as creating a corporation, association, partnership or joint venture of any kind for United States federal income tax purposes or for any other purposes.

[Signature Pages Follow]

4878-7882-9640.5

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives, or agents, effective as of the date first written above.

NORTHWEST SENIOR HOUSING CORPORATION

By: _____
Name: _____
Title: _____


SENIOR QUALITY LIFESTYLES CORPORATION

By: _____
Name: _____
Title: _____


RESIDENTS TRUST
TRUSTEE

_____
Name: _____


INITIAL RESIDENTS
TRUST ADVISORY BOARD

_____
Name: _____


_____
Name: _____


_____
Name: _____

4878-7882-9640.5